**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thomas Rae STONE,
Defendant-Appellant.**

No. 80–5273.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Oct. 19, 1981.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

**570**

Larry G. Turner, Robert P. Cates, Gainesville, Fla., for defendant-appellant.

Elizabeth A. Jenkins, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before FAY, FRANK M. JOHNSON, Jr. and THOMAS A. CLARK, Circuit Judges.

FAY, Circuit Judge:

This case presents the Court with a renewed opportunity to articulate the factors which the government must establish in order to justify a border search. The defendant, Thomas Rae Stone, appeals his jury conviction of importing and possessing approximately 200 pounds of marijuana and 671 pounds of methaqualone, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 812, 952(a) and 960(b)(2). Stone contends that the trial judge should properly have granted his motion to suppress evidence obtained in the search of his airplane. Ruling that a border-type search was not supportable under the facts, the district court nevertheless denied the motion to suppress on the grounds that the existence of probable cause and exigent circumstances rendered the search fully reasonable under the fourth amendment. While the government seeks to affirm the trial judge's denial of the motion to suppress, it asks this Court to do so by finding that a valid border search indeed occurred. Based on our careful consideration of the relevant facts and law and for the reasons explained below, we acquiesce fully in the government's request.[1]

I.

Our analysis begins with an examination of the facts leading up to the search. On October 3, 1979, between 4:30 and 5:00 a. m., Roy Weaver, a United States Customs Air Officer on duty at the Air Support Branch, Federal Aviation Administration Control Center in Miami, received a report of a near collision between two aircraft over foreign airspace. One of the pilots involved had informed the FAA that his craft was almost hit by another plane at an altitude of about 10,000 feet in Amber 16[2] airway over Andros Islands in the Bahamas. Responding to this information, Weaver monitored the area on raw radar. He spot-

---

1. In view of our holding that a valid border search occurred, we do not address the trial court's ruling that probable cause and exigent circumstances existed to justify the search. Nevertheless, having reviewed the record in detail, we note that were the issues of probable cause and exigent circumstances reached here, we would affirm.

2. Amber 16 is an airway across the Caribbean, analogous to a vehicular highway on the ground. Trial transcript at 64.

ted a plane headed in a north-northwesterly direction on Amber 16 above Andros Islands. As a Customs Officer, Weaver's duties included radar detection of planes entering the United States suspected of carrying contraband. An aircraft's failure to operate a transponder;[3] lack of a flight plan;[4] flying at night; and flying towards the United States from a southeasterly direction are central criteria indicative to Customs of smuggling activities. Memorandum of Decision of suppression hearing at 6, 8; trial transcript at 73; suppression hearing transcript at 17. Customs Officer Weaver noted the presence of each of these factors with regard to the plane which he sighted that morning: The aircraft was flying at night over the northwest corner of Andros Islands east of Bimini, travelling towards the United States from a southeasterly direction. The plane was not using a transponder and did not have a flight plan.

His suspicion consequently aroused, Weaver directed the pilot of a United States Customs pursuit plane in the vicinity to intercept the craft. By means of infrared radar on board the Customs chase plane, the target was identified as a small twin-engine Beechcraft airplane. Radar and visual contact with the target was maintained until it approached Bimini. Since the initial chase plane was low on fuel, surveillance was then assumed by another Customs craft. As this second plane neared interception of the target, the latter turned off its lights. Visual contact was lost because of the ensuing darkness; however, radar observation of the target was continued without a break by means of infrared radar scope. Mechanical difficulties subsequently forced the second pursuit plane to return to base. Customs Officer Weaver maintained constant radar surveillance of the plane until it dropped off the radar screen southeast of Orlando. At that point, an FAA air traffic controller stationed in Orlando took over surveillance of the plane, which Weaver had identified for him according to the craft's location, altitude, tail number and type, until its landing at Orlando International Airport. At 6:30 a. m., an Orlando-based Customs agent, Robert Malley, was informed that a suspect was expected to land in his area. After requesting the help of local police, he proceeded to the airport. Meanwhile, Orlando police officer David Goode was informed of Customs surveillance of a twin-engine Beechcraft plane, tail number N211K, which was coming in from foreign airspace and was expected to land in Orlando. Spotting the craft, Officer Goode followed it to the Page Airways terminal at Orlando International Airport. He approached the defendant and another individual as they exited the plane, and told them he was detaining them for Customs purposes. Agent Malley arrived ten minutes later. Officer Goode noted the plane's dirty and damaged condition. The front landing gear had grass stains, the wings were damaged, and the tip of one propeller was curled. In addition, the side windows of the plane appeared to have been covered with tape. The appellant identified himself as the plane's pilot and owner, and shrugged his shoulders at the agent's request to search the craft. After reading Stone his *Miranda* rights, Malley opened the plane. He immediately detected the odor of marijuana and observed a plastic bag containing white pills. The ensuing search yielded 200 pounds of marijuana and 671 pounds of methaqualone. One of the plane's navigational charts displayed a highlighted line

---

**3.** A transponder is a device which emits a radio signal enabling air traffic controllers to locate, identify and monitor the craft for safety reasons. Trial transcript at 25–26.

**4.** According to Bahamian law, a plane flying over the Bahamas in darkness, which is considered to last from one-half hour after sunset until one-half hour before sunrise, must be on a flight plan. A flight plan is also required by F.A.R. Part 91, a federal air regulation relating to the Air Defense Identification Zone (ADIZ). An aircraft penetrating this zone, which establishes a national defense boundary, must be on a flight plan, make position reports and adhere to the time, place and altitude schedule set forth in the plan. Memorandum of Decision of suppression hearing at 6; testimony of Kevin Phillips, trial transcript at 66–68.

from Colombia to Gainesville, Florida. Subsequent to the search, Stone and his co-defendant, Valle, were both arrested.

## II

Border searches constitute a well-hewn exception to the mandate of the fourth amendment. Neither a warrant nor any level of suspicion is required to search vehicles, vessels, persons or goods arriving in the United States. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). The rationale for this doctrine, which "has a history as old as the fourth amendment itself," *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1981, 52 L.Ed.2d 617 (1977), is the fundamental necessity for national self-protection against unlawful entries from without. *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). In furtherance of this crucial policy, the parameters of the doctrine have expanded to encompass searches far beyond the physical boundaries of the United States:

> A border search need not take place at the actual border. It may be conducted at a place considered "the functional equivalent of the border," such as the port where a ship docks in this country after entering our territorial waters from abroad, *United States v. Prince*, 491 F.2d 655 (5th Cir. 1974), or the airport where an international flight lands, *United States v. Klein*, 592 F.2d 909 (5th Cir. 1979).

*United States v. Richards*, 638 F.2d 765, 771 (5th Cir. 1981).

Furthermore,

> a particular *search* may be the functional equivalent of a search at the border if the object of the search has been kept under constant surveillance from the border to the point of search.

*United States v. Johnson*, 588 F.2d 147, 154 (5th Cir. 1979).

Contributing to this logical extension is the obvious difficulty of stopping an airplane or vessel for inspection at the precise point it crosses an imaginary boundary in air and water. From the facts surrounding the instant airplane search, an unmistakably clear picture, fitting neatly within this established doctrinal framework, emerges: An aircraft, first sighted over foreign air space after a reported near mid-air collision, was monitored by government officials as it entered our air space and touched down on United States soil for the first time at Orlando International Airport. Uninterrupted surveillance permitted its identification according to type of aircraft and tail number. Observation by local police and a Customs agent at Orlando International Airport of the damaged condition of the craft further corroborated its identity as the plane reported to have been involved in a near-collision over Andros Islands. On these facts, we hold that the airport inspection of the craft constituted a valid border search. Where an airplane or, for that matter, a person, vessel, object or vehicle has been sighted over foreign land, air or water and has been monitored continuously thereafter as it crosses the boundary of this country, its inspection by Customs at the first point it touches land is fully valid as a border search. Neither probable cause nor reasonable suspicion of criminal activity is necessary to validate such a search. Its justification derives from the single fact that the boundary of the United States has been crossed, since "the object under such surveillance 'brings the border with it' to the point of search." *United States v. Johnson*, 588 F.2d 147, 154 (5th Cir. 1979) (citing *United States v. Brennan*, 538 F.2d 711, 715 (5th Cir.), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977)). *See also United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980) (*en banc*).

Any other conclusion would appear not only to deviate from the trend of the prevailing law in this area but, more ominously, to betray the very purpose of the border search doctrine: the elemental right of the United States to defend its borders by controlling "who and what may enter this country." *United States v. Ramsey*, 431 U.S. at 620, 97 S.Ct. at 1980. *See also United States v. 12 200 Foot Reels of Film*,

413 U.S. 123, 125, 93 S.Ct. 2665, 2667, 37 L.Ed.2d 500 (1973); *United States v. Thirty Seven Photographs*, 402 U.S. 363, 376, 91 S.Ct. 1400, 1408, 28 L.Ed.2d 822 (1971); *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

The appellant, however, would have the court apply a different standard. He would require that, in order to establish a valid border search, the government must demonstrate not only that a border has been crossed but, additionally, that the entering craft has left foreign land. Such an added requirement, however, is tenable neither in law nor in logic. In no case has a border search been invalidated because the object's departure from foreign soil was not demonstrated. Instead, a legion of cases have made clear that the propriety of a border search rests on the "critical fact" of whether or not a border crossing has occurred:

> The *critical fact* is that the envelopes crossed the border and entered this country . . . It is their entry from without that makes a resulting search "reasonable." *United States v. Ramsey*, 431 U.S. 606, 620, 97 S.Ct. 1972, 1981, 52 L.Ed.2d 617 (1977) (emphasis added).

*United States v. Johnson*, 588 F.2d 147, 155 (5th Cir. 1979).

Some cases have required evidence demonstrating a high degree of probability that the border has been crossed. *United States v. Ivey*, 546 F.2d 139, 142 (5th Cir.), *cert. denied*, 413 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977); *United States v. Brennan*, 538 F.2d 711, 715 (5th Cir.), *cert. denied*, 492 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977); *United States v. Adams*, 569 F.2d 924, 925 (5th Cir.), *cert. denied*, 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (5th Cir. 1978). Others have held that a border crossing must be proved by a preponderance of evidence. *United States v. Johnson*, 588 F.2d at 154; *United States v. Walters*, 591 F.2d 1195, 1198, n.1 (5th Cir.), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979). Still others have ruled

that a reasonable suspicion that the border has been crossed suffices. *United States v. Fogelman*, 586 F.2d 337, 343 (5th Cir. 1978). Whichever of these standards of proof is applied, however, once it is established that a border crossing has occurred and that the object has been continuously monitored to the point of inspection, a border search conducted at the first domestic landing is proper.[5]

The appellant points to the frequent failure of Customs officials to search objects, such as fishing vessels, which, although they have not departed from foreign territory, have crossed the border. This, however, begs the question, for the mere fact that Customs does not search each vessel or vehicle or person entering the United States does not in any way signify that it is not entitled to do so. To the contrary, it is clear that should Customs elect to inspect each individual or item as it enters our borders, it could do so with complete impunity. 19 U.S.C. § 1581(a); *United States v. Peabody*, 626 F.2d 1300, 1301 (5th Cir. 1980); *Witt v. United States*, 287 F.2d 389, 391 (9th Cir. 1961).

In the instant case, the actual sighting of the aircraft as it passed from foreign to United States airspace fulfilled the essential criteria of evidence of a border crossing. Even applying the more exacting standard of a "high degree of probability," such a crossing was clearly established; the appellant himself has conceded this entirely. No further need existed for the government to show that the aircraft actually left foreign soil. Accordingly, we affirm the trial judge's denial of a motion to suppress, but on the grounds that the inspection of the airplane at Orlando International Airport constituted a proper border search.

Additional grounds for reversal raised by the appellant are the purported insufficiency of the evidence to support a conviction of importation, and the alleged prejudicial admission of testimony regarding the absence of a flight plan. The court

---

5. Such a location is in fact the functional equivalent of the border. *See United States v.*

*Sheikh,* 654 F.2d 1057, 1070 n.16 (5th Cir. 1981).

has reviewed each of these points and has found them to be lacking in merit.

For the foregoing reasons, the appellant Stone's conviction of importing and possessing controlled substances is hereby AFFIRMED.