UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael Lee MESSERSMITH,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert Joseph HANLEY,
Defendant-Appellant.

Nos. 81–5180, 81–5254.

United States Court of Appeals,
Eleventh Circuit.

Dec. 6, 1982.

Rosen & Rosen, Michael J. Rosen, Miami, Fla., for defendants-appellants.

Elizabeth A. Jenkins, Asst. U.S. Atty., Orlando, Fla., for plaintiff-appellee.

Appeals from the United States District Court for the Middle District of Florida.

Before HILL and HENDERSON, Circuit Judges, and GARZA *, Senior Circuit Judge.

GARZA, Circuit Judge:

In this consolidated appeal of two defendants from convictions for unlawful possession and importation with intent to distribute of approximately 1,867 pounds of methaqualone, four points of error are raised. Defendants urge this Court to find that the district court erred in holding that defendants had no expectation of privacy in the aircraft where the controlled substance was found, failing to suppress the evidence seized from the aircraft, and admitting evidence of prior criminal acts. The point most vigorously argued, however, goes to the very heart of the investigation conducted in this case. Defendants assert that the court-ordered electronic surveillance which made their arrests possible was fatally flawed by an improper authorization.

In December, 1979, the United States Customs Service and the Drug Enforcement Administration (DEA) joined forces to investigate the activities of Jerome Palacino, a man suspected of importing controlled substances. Specifically, the agents hoped to identify members of organized crime for whom they believed Palacino worked.

█ The individuals who were convicted by the court below came under suspicion in part as a result of a number of telephone conversations taped from the phone of Jerome Palacino. The electronic surveillance which made this possible had been approved by a district judge upon application from Assistant Attorney General Philip Heymann. Defendants contend that the evidence must be suppressed because Mr. Heymann was not authorized to make this application. The relevant statute confers power on "[t]he Attorney General, or any Assistant Attorney General specially designated by the Attorney General" to seek an order approving the interception of oral communications. 18 U.S.C. § 2516. The alleged impropriety in this case arises from the fact that Griffin Bell, the Attorney General who designated Mr. Heymann to perform this task, was no longer serving as Attorney General at the time the application was made. On that date, Benjamin Civiletti was Attorney General. Attorney General Civiletti had not revoked Mr. Heymann's designation by Bell, but neither had he redesignated Heymann, a fact which allegedly left Heymann without power to seek authorization for the surveillance. In ruling on this portion of defendants' case, the trial judge found that the application was proper, concluding that "[t]he fact that the Attorney General who authorized Philip Heymann to authorize the application was not in office at the time the application was filed is legally insignificant." Record on Appeal, vol. 7, at 274.

Defendants base their challenge on both the express wording of the statute and *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). *Giordano* involved an application for a wiretap order which reflected that Assistant Attorney General Will Wilson had authorized it when in fact the Executive Assistant to the Attorney General had done so. The Supreme Court ordered the suppression of all evidence obtained from the wiretap and reasoned that only those officers listed in the statute could exercise the authority given. A discussion of the legislative history of the Act confirmed the Congressional design to limit the authority to make decisions of this magnitude to a very small group of persons appointed by the President with the advice

---

* Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

and consent of the Senate. While the Attorney General and Assistant Attorneys General fit within this category, the Executive Assistant does not. Defendants necessarily argue for a different interpretation of *Giordano.* They maintain that the only source of the political accountability stressed in *Giordano* is the Attorney General's special designation. When Griffin Bell left office, they contend, his designation of Heymann followed him. We do not concur. *Giordano* did establish the number of persons who have the power to seek a federal judge's authorization to wiretap, but it did not decide the question presented today: the lifespan of a properly made designation.

A challenge very similar to defendants' was recently rejected by the Fourth Circuit in *United States v. Mallory,* 674 F.2d 224 (4th Cir.), *cert. denied,* 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982). The Court analyzed *Giordano* and found nothing to support a departure from the usual rule that the act of an administrative official continues in effect until it is revoked. The Court also determined that the statute addressed not this tenet of administrative law, but rather the necessity of limiting the decision making process in this context to a small group of individuals who are politically accountable for their actions.

The first flaw in the defendant's argument is that he incorrectly identifies the special designation as the foundation for the political accountability of the Assistant Attorneys General. In truth, the Court identified the fact that the Assistant Attorneys General were appointed by the President with the advice and consent of the Senate as the foundation for their political accountability. *See id.* at 520 n. 9, 94 S.Ct. at 1829 n. 9. Indeed, if delegation from the Attorney General is the touchstone for political accountability, *Giordano* may well have been decided differently.

The more significant flaw in the defendant's argument is that the signature on the written designation has next to nothing to do with the nature of the delegation. The defendant cannot rationally maintain that Assistant Attorney General Heymann was exercising his au-

thority without the knowledge and consent of Attorney General Civiletti. The fact that Attorney General Civiletti relied on the old designation, as we hold that it was proper for him to do, instead of signing a new one simply does not implicate the concerns behind the statute. We can see no basis for holding that § 2516(1) represents a deviation from the usual rule that administrative orders ordinarily remain in effect beyond the tenure of the individual who issued them. If the language of § 2516(1), read literally, is thought to indicate otherwise, we note that the Supreme Court has declined to suppress evidence where the government failed to follow the literal language of the wiretap statute but no violation of consequence occurred, *see United States v. Chavez,* 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974) (decided the same day as *Giordano* ) (§§ 2518(1)(a) & (4)(d) were violated in that the wrong official was identified as the one who had authorized the application; no suppression of evidence was necessary where the official who actually authorized the application was empowered to do so).

674 F.2d at 227. Finding nothing in the wording of *Giordano* to support a departure from the usual rule, we hold that Heymann was properly designated to make the challenged application.

■ In anticipation of an adverse determination on the question of validity of the designation, defendants maintain that the evidence must be suppressed because of the government's failure to comply with the applicable statute by providing "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous ...." 18 U.S.C. § 2518(1)(c). We are unable to concur in defendants' judgment that the cooperation of an informant clearly negated the need for electronic surveillance. The affidavit of DEA Special Agent Thomas Manson does not reflect what is characterized by defendants as "complete success" using normal investigative techniques. Instead, it dem-

onstrates that the target of the investigation, Jerome Palacino, was very wary of the traditional investigative techniques which could have substituted for the challenged electronic surveillance. Record on Appeal, vol. 6, at 128–30. Palacino even patted down the informant at one point to check for the presence of recording equipment, and the location of Palacino's apartment prohibited effective visual surveillance. Furthermore, given the aim of the investigation to identify the organized crime members who controlled Palacino's enterprise and the corresponding unwillingness of Palacino to discuss this topic with the informant, electronic surveillance offered the only possibility of success. It is true that wiretapping is an extreme measure which is not to be routinely employed as the initial step in criminal investigation; it is also true that where, as here, a host of other investigative tools had been considered and properly rejected, the use of this special investigative tool is warranted.

■ Defendants also appeal the district court's adverse ruling on their motion to suppress the evidence upon which their convictions were ultimately based. The judge ruled that the search of the aircraft in which the controlled substance was found was properly based upon "probable cause to believe that the aircraft contained and was utilized in transporting contraband, but also that a high degree of probability existed that it had just entered the United States from a foreign port without going through a customs check." Record on Appeal, vol. 3, at 367. Since we base our approval of the search in question on the power of Customs officers to search any vehicle, vessel, person, or good arriving in the United States without warrant or any articulable level of suspicion,[1] we need only discuss the evidence demonstrating that the plane had indeed arrived from a foreign destination and not previously cleared Customs.

The Fifth Circuit, writing in *United States v. Stone*, 659 F.2d 569 (5th Cir.1981), pointed out that border search cases have not spoken with one voice about the degree of proof required to establish a border crossing.

Some cases have required evidence demonstrating a high degree of probability that the border has been crossed. *United States v. Ivey*, 546 F.2d 139, 142 (5th Cir.), *cert. denied*, 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977); *United States v. Brennan*, 538 F.2d 711, 715 (5th Cir.), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977); *United States v. Adams*, 569 F.2d 924, 925 (5th Cir.), *cert. denied*, 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (5th Cir.1978). Others have held that a border crossing must be proved by a preponderance of evidence. *United States v. Johnson*, 588 F.2d [147] at 154; *United States v. Walters*, 591 F.2d 1195, 1198, n. 1 (5th Cir.), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979). Still others have ruled that a reasonable suspicion that the border has been crossed suffices. *United States v. Fogelman*, 586 F.2d 337, 343 (5th Cir.1978).

659 F.2d at 573. This Circuit resolved this issue in *United States v. Garcia*, 672 F.2d 1349 (11th Cir.1982), holding that the evidence must be viewed to determine whether "there was a substantial likelihood that the plane has come from a foreign location." 672 F.2d at 1358. The evidence must be tested for compliance with this standard.

By the time the officers searched the Beechcraft Kingair plane in question, they had amassed quite a volume of information indicating that the plane had entered from a foreign country without clearing Customs. This information came from a number of sources, including a documented informant, Customs authorities, the El Paso Intelligence Center (EPIC), and recorded conversations on Palacino's tapped telephone. Much of this information was gathered by a documented Customs informant named Leonard Johnson. Johnson was introduced to Palacino as a professional pilot. As Johnson became familiar with Palacino's operations, he came into repeated contact with the defendants and reported their ac-

1. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1979).

tivities to Customs Patrol Officer (CPO) Russ Manhold.

Johnson first saw Messersmith and Hanley in January, 1980, at the Fort Lauderdale Airport. He did not meet them until March of that year, when he flew with them to Costa Rica to inspect a DC 3 airplane which Palacino wished to overhaul. Johnson later told CPO Manhold that defendant Messersmith related that he had made seven or eight trips to Colombia as a co-pilot. The next month, Johnson informed CPO Manhold that he had returned to Costa Rica with the defendants and, a few days later, set out for Colombia to pick up three million quaaludes for Palacino. Engine trouble forced them to abandon their scheme and return to Miami. At trial, CPO Manhold reported seeing the three pass through Customs in Miami upon their return.

Evidence from the court-ordered electronic surveillance also aided officers in their detection of this drug smuggling venture. On April 19th, agents heard Palacino and defendant Hanley discuss a drug importation venture. Palacino asked Hanley to fly to Colombia to pick up forty boxes of "pills." Palacino mentioned that defendant Messersmith would be the co-pilot. After receiving this information, CPO Manhold contacted the EPIC and reported that a Beechcraft Kingair N733KL (N733KL) would be involved in a smuggling operation from Colombia to Florida. He also related the involvement of Hanley, Messersmith, and Palacino in this venture. The EPIC transmitted this information to several law enforcement agencies, as well as the Federal Aviation Administration and similar agencies in Caribbean countries.

On April 21st, agents heard Palacino discuss the route of the plane to Colombia and back. He mentioned Sanford and Lake City, Florida as possible destinations for the load. On April 23rd, agents intercepted a conversation in which Palacino said he expected the plane to return on April 25th. Additional evidence of the route of the plane was supplied by law enforcement au-

thorities throughout the Caribbean. When Hanley and Messersmith departed from Florida on April 22nd, they filed a flight plan showing South Caicos as their intended destination. This was not the plane's final destination, however. That same day, an agent with the Bureau of Narcotics in Costa Rica saw the aircraft at the International Airport in Santa Marta, Costa Rica. The agent testified at trial, where he identified both defendants and stated that they arrived and left in N733KL on that date. The defendants departed after filing a flight plan to Cartagena, Colombia. CPO Manhold learned through EPIC that they landed in Cartagena at 10:00 p.m. that evening.

On April 25th, CPO Manhold received information from EPIC that N733KL had departed from Cartagena after filing a flight plan to South Caicos. That same morning, the Customs informant was contacted by Palacino to find a plane to fly to South Caicos. This information was relayed to Manhold before Johnson left with Palacino and served as yet another indicator, albeit minor, of N733KL's imminent return.[2] Based on the information that he had received, Manhold decided to alert Customs personnel and airport officials of the probable arrival of N733KL that evening. When the aircraft contacted Herndon Airport in Orlando, Florida, at approximately 10:30 that evening to request information about turning on the runway lights at an airport in the vicinity so that it could practice landing, the air traffic controller recognized the aircraft as being on the EPIC look-out list. He immediately called both Customs and EPIC to report the contact. Approximately thirty minutes later, he received a call from a security officer at the neighboring airport advising him that a "loaded" Beechcraft Kingair N733KL was headed to Herndon. A few minutes later, he was contacted again by the aircraft regarding weather and runway conditions.

---

**2.** Palacino flew to South Caicos and then to North Caicos in order to guard the off-loaded shipment of controlled substances while de- fendants flew to South Caicos to refuel, Johnson later reported.

About this time, CPO Thomas Smith arrived at Herndon to see if N733KL had landed at the airport where he had last seen it. As he was talking to a security officer outside the terminal, defendants Messersmith and Hanley walked by carrying luggage. Hanley remarked to the security officer that he had parked his aircraft since there was no one to park it. Just a minute later, CPO Smith received radio confirmation that N733KL had landed. He and the security officer located the plane at approximately 11:45 p.m. Although the plane was locked, the shade was only partially drawn and the cardboard boxes inside were visible. Before any search was conducted, however, Smith had received information from the regional Customs communication network (Sector 4) that the plane had arrived from South Caicos without seeking Customs clearance. The search was then conducted and more than 1,867 pounds of methaqualone were seized.

■ The information possessed by authorities prior to the search was certainly adequate to establish a substantial probability that the plane had arrived from a foreign destination without clearing Customs. A non-stop flight from outside the United States bring the border with it, and its occupants and cargo are subject to Customs search at the point of destination. *United States v. Stone,* 659 F.2d 569 (5th Cir.1981). Although defendants would have us hold otherwise, the application of this rule does not depend on an aircraft being under actual observation from outside the United States to the first inland point of termination. Customs agents are entitled to draw reasonable inferences from circumstances and base their actions on common sense judgments. *United States v. Ivey,* 546 F.2d 139 (5th Cir.), *cert. denied,* 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977). Agents acted properly here, and the court below committed no error when it denied defendants' motion to suppress.[3]

■ The final point of appeal presented by defendants is an evidentiary one. The district court, over defense objection, admitted the testimony of confidential informant Johnson that he and both defendants went to Costa Rica in early April, 1980, for the purpose of smuggling three million quaaludes into the United States. This testimony was admitted under Federal Rule of Evidence 404(b), which provides:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ The trial court permitted the introduction of this evidence to show plan, intent and identity of defendants as the persons who committed the crime charged in the indictment. In ruling on a challenge of this nature,

[f]irst, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403.

*United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). The drug smuggling operation which these defendants conducted two weeks before the crime charged is clearly relevant to their identity as the individuals who committed this crime. The operation which the informant described has the same unusual features as the crime charged. Both trips were financed by Palacino, both trips involved the two defendants, both trips involved a departure from Costa Rica to Colombia with an intended fuel stop at Caicos, and both trips were made for the purpose of picking up large quantities of quaaludes. Given these similarities, as well as the short space

---

**3.** The government maintains that the defendants lack standing to challenge the search conducted here. In light of our holding that the search was proper, however, we need not consider this position.

of time between the two incidents, the court properly found that the probative value of the evidence was not outweighed by its prejudice to the defendants.

Finding all of defendants' objections without merit, we affirm the judgment below.

AFFIRMED.