UNITED STATES of America, Plaintiff-Appellee,

v.

Douglas Frank HALEY, Defendant-Appellant.

No. 82–8435.

United States Court of Appeals, Eleventh Circuit.

Oct. 9, 1984.

Rehearing and Rehearing En Banc Denied Nov. 15, 1984.

Michael L. Pritzker, Chicago, Ill., for defendant-appellant.

Louis Fischer, Sidney M. Glazer, Washington, D.C., Wm. H. McAbee, Asst. U.S. Atty., Savannah, Ga., for plaintiff-appellee.

Before TJOFLAT and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

JOHNSON, Circuit Judge:

Appellant Douglas Frank Haley was convicted in the United States District Court for the Southern District of Georgia of possession with intent to distribute cocaine in violation of 21 U.S.C.A. § 841(a)(1). Haley appeals, claiming that the district court erred in denying his motion to suppress evidence allegedly obtained in violation of the Fourth Amendment.[1] The district court relied on the border search exception to the Fourth Amendment in so ruling. Haley contends that the border search exception does not apply to the facts of this case. We affirm.

On February 17, 1982, at approximately 8:05 a.m., Haley took off from the Ft. Lauderdale, Florida, Executive Airport in a Cessna 310 airplane. Haley chose to fly by Visual Flight Rules (VFR) and was not required to, and did not, file a flight plan.[2]

---

1. Haley also claims that the district court improperly limited the testimony of a defense witness pertinent to his defense of duress. Haley's defense was that he and his family were threatened with physical harm if he did not agree to fly the airplane with the cocaine from Florida to Indiana. The district court allowed the witness *to testify that Haley had asked him if these* threats were genuine. The district court excluded other testimony concerning what Haley had told the witness about the threats because the court found this testimony to be the "rankest hearsay." We agree, and find no error in this ruling. Haley contends that the district court prejudiced his case by so labeling this proffered testimony in front of the jury. We hold that the district court's evidentiary ruling was not prejudicial.

Haley finally claims that the jury should have been instructed on the lesser included offense of *simple possession. No evidence was introduced* to support such an instruction. Instead, the evidence established that Haley possessed more cocaine than could be used personally and Ha-

ley, by his duress defense, admitted that he planned to drop the cocaine off in Indiana. We hold that the district court did not err in refusing to instruct the jury on simple possession.

2. The testimony at the suppression hearing was to the effect that a pilot may elect to fly by either Visual Flight Rules (VFR) or Instrument Flight Rules (IFR). A VFR flight, where the pilot is to "see and be seen," requires no "separation" by the FAA. Separation is defined as FAA guidance to the pilot in keeping the aircraft 1,000 feet apart from other aircraft. If a pilot desires the FAA to provide separation, he files an IFR flight plan and is in contact with an FAA facility. Further, a pilot may also choose to file a VFR flight plan. Although no separation is provided, the FAA initiates search and rescue missions for aircraft on a VFR flight plan that do not arrive at their stated destinations within a specified time. In sum, the evidence at the *hearing revealed that, although there is no re*quirement for a pilot to file a flight plan for a VFR flight, a procedure for filing a VFR flight plan is available and recognized by the FAA.

Shortly after take-off, Haley contacted the FAA flight service station at Miami, Florida, and requested weather information for the Daytona Beach/Jacksonville, Florida, area. At 10:08 a.m., Haley communicated with the service controller at the FAA flight station in Melbourne, Florida. Haley identified his aircraft, stated his position, and requested the weather en route to Daytona Beach. After being advised that the weather forecast included the possibility of thunderstorms in that area, Haley stated that he would continue to Daytona Beach and, if it looked as though he couldn't make it, would return to Vero Beach or Ft. Lauderdale. Five minutes later, Haley again contacted the controller at Melbourne, identified his aircraft, gave his position, stated he was over the water and added that it "looked good there."

The next official contact with Haley occurred when his airplane was detected by the North American Defense Command (NORAD) 50 nautical miles northeast of Ormond Beach, off the coast of Florida, and outside the territorial limits of the United States.[3] NORAD contacted the Customs radar facility at Jacksonville, Florida, and informed it that an unidentified airplane was entering United States airspace. In response to this message, a Customs radar operator located the airplane on his screen; it was 73 nautical miles east of Jacksonville, off the coast of Florida, and was headed in a northwesterly direction. A Customs jet was sent to intercept the unidentified airplane, track its course and follow it to its point of destination. The Customs jet intercepted Haley's airplane approximately five miles southeast of Brunswick, Georgia, and kept surveillance over the airplane until it crossed the United States border and landed at the closed Brantley County, Georgia, airport at approximately 10:30 a.m. Haley's airplane was continuously kept under surveillance

both by radar and by the Customs jet from the time it was first sighted until its landing. At no point during this time did Haley identify himself or announce where and when he would land.[4]

The surveillant Customs jet was too large to land at the Brantley County airport so it circled overhead until a smaller Customs aircraft arrived. When the Customs officers from this plane questioned Haley, he informed them that he had taken off from southern Florida and had flown out over the ocean to avoid a thunderstorm. Haley's airplane was searched and 852 grams of cocaine were discovered.

Based on these facts, the district court held that the warrantless search of Haley's airplane was a valid border search.

Border searches are a well-established exception to the mandate of the Fourth Amendment: "neither a warrant nor any level of suspicion is required to search vehicles, vessels, persons or goods arriving in the United States." *United States v. Stone*, 659 F.2d 569, 572 (5th Cir. Unit B 1981). This is so because the "border search exception is grounded in the recognized right of the sovereign to control ... who and what may enter the country." *United States v. Ramsey*, 431 U.S. 606, 620, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977). Stated differently, "the rationale for the [border search] doctrine, which 'has a history as old as the fourth amendment itself,' [*id.* at 619, 97 S.Ct. at 1980], is the fundamental necessity for national self-protection against unlawful entries from without." *Stone, supra*, at 572. In furtherance of this crucial policy, and in recognition of the "obvious difficulty of stopping an airplane or vessel for inspection at the precise point it crosses an imaginary boundary in air and water," the border search exception has been held applicable

---

3. A three mile territorial limit has been recognized as the border of the United States for purposes of ocean border crossing cases. *United States v. Garcia*, 672 F.2d 1349, 1357 & n. 10 (11th Cir.1982).

4. Customs Officer Allman, the radar operator at Jacksonville, testified at the suppression hearing that "[i]f you're flying VFR, you're usually squawking 1200 on your code in the aircraft ... [Haley] wasn't squawking 1200.... If he followed a VFR, then he should be squawking 1200 ..." R.Vol. 2 at 30.

to searches at points beyond the physical boundaries of the United States:

> "A border search need not take place at the actual border. It may be conducted at a place considered 'the functional equivalent of the border,' such as the port where a ship docks in this country after entering our territorial waters from abroad, *United States v. Prince*, 491 F.2d 655 (5th Cir.1974), or the airport where an international flight lands, *United States v. Klein*, 592 F.2d 909 (5th Cir.1979)."

*United States v. Richards*, 638 F.2d 765, 771 (5th Cir.1981).

Furthermore,

> "a particular *search* may be the functional equivalent of a search at the border if the object of the search has been kept under constant surveillance from the border to the point of search."

*United States v. Johnson*, 588 F.2d 147, 154 (5th Cir.1979).

*Id.*

■ In the present case, it is undisputed that the search of Haley's airplane at the Brantley County airport occurred at the functional equivalent of the border. Likewise, the fact that Haley's airplane actually crossed the border is not in dispute. Instead, Haley claims that because his flight originated from a point within the United States and not from a foreign location the requirements for a valid border search were not met. Two cases binding on this Court have addressed this precise issue and control our disposition of this case.

In *United States v. Stone*, the former Fifth Circuit rejected the defendant's argument that "in order to establish a valid border search, the government must demonstrate not only that the border has been crossed, but, additionally, that the entering craft has left foreign land." 659 F.2d at 573. Following *Stone*, this Court in *United States v. Garcia*, 672 F.2d 1349, 1357 (11th Cir.1982), held a claim that "even if a border crossing was established the government must prove that the flight originated in a foreign country" to be

"without merit." We therefore must also reject Haley's claim of error to the extent that he argues that the government was required to prove that his airplane originated from a foreign location in addition to its direct proof that his airplane crossed the border.

■ Our inquiry does not end here. Although rejecting the requirement that the government prove the flight originated in a foreign location, the *Garcia* court did require that the government prove facts in addition to that of a border crossing in order to validate an airplane border search. In so holding, the *Garcia* court authoritatively limited and clarified *Stone*. Noting that "although the [*Stone*] panel required no further proof [than the border crossing] that the plane's point of origin was foreign, the government's evidence in *Stone* reasonably supported an inference that the aircraft's origin was other than in the United States," the *Garcia* court rejected a broad reading of the language in *Stone* to suggest that "the question of point of origin has no bearing on the reasonableness of a search so long as a border crossing has been established." *Id.* (footnote omitted). Instead, the *Garcia* court stated that: "We would not be prepared to uphold as a border search ... a search of an aircraft whose *known* points of origin and landing were within the United States simply by virtue of the fact that the plane had passed over international waters en route." *Id.* (emphasis in original). Since "planes that pass through international waters do not present any possibility of foreign contacts other than that presented by their actual stopping in a foreign country," the *Garcia* court reasoned that "the question of proof of a border crossing in the context of an airplane search, contrary to the dicta in *Stone*, cannot wholly be divorced from the issue of the plane's point of origin." *Id.* at 1358 (footnote omitted). In light of this analysis, the *Garcia* court held that "the proof of the crossing must be viewed together with the other evidence to determine whether there was a substantial likelihood that the plane has come from a for-

eign location." *Id.* This standard for evaluating the proof necessary to authorize an airplane border search is binding on this Court and must be applied to the facts of this case. *United States v. Messersmith,* 692 F.2d 1315, 1318 (11th Cir.1982).[5] More precisely, we must determine if the information, including the fact of the actual border crossing, possessed by the Customs agents prior to the search of Haley's airplane was sufficient to reasonably support an inference that there was a substantial likelihood that the airplane had come from a foreign location. *See id.* at 1320.

We again turn to *Garcia* and *Stone* for guidance as to the "other evidence" which, in addition to proof of a border crossing, will reasonably support an inference that there is a substantial likelihood that an airplane came from a foreign location.

In *Stone,* the defendant's airplane was first sighted by Customs officials in the vicinity of a near mid-air collision over the Andros Islands and was constantly kept under surveillance by radar and visual contact from this point until its landing at the Orlando International airport. The surveillant Customs officers noted that defendant's airplane was not operating a transponder, a device which emits a radio signal enabling traffic controllers to locate, identify and monitor the craft for safety reasons, did not have a flight plan, turned off its lights after visual contact began, and was flying at night over the northwest corner of the Andros Islands east of Bimini, traveling towards the United States from a southeasterly direction. The *Stone* court noted that these factors were central criteria indicative to Customs of smuggling activities. Therefore, as the *Garcia* court found, in addition to proof of the border crossing there was present in *Stone* evi-

dence reasonably supporting an inference that there was a substantial likelihood that the plane's origin was other than in the United States.

In *Garcia,* in addition to proof of an actual border crossing, "the plane in question [was] shown to have pierced the air defense identification zone travelling from the southeast toward this country without having filed a flight plan or notifying U.S. government officials of its pending arrival as required by federal law." 672 F.2d at 1358. Based on these facts, the court held that:

> The government is entitled to draw the inference that [the airplane's] point of origin was foreign and accordingly to conduct a search of the airplane without a warrant or any suspicion of criminal activity.
>
> . . . .
>
> A plane that crosses the border without complying with these requirements [to identify itself and to inform the government of its origin and intended destination] may not create a fourth amendment privacy interest by refusing to show the government that its point of origin was not foreign. If it came from outside the United States it has no fourth amendment immunity from a warrantless search; if its origin was domestic the government has provided a method by which that fact may be established, and one who fails to comply with that procedure is estopped from asserting a domestic point of origin after landing in this country.

*Id.*

Although no one single factor was held to be determinative by either the *Garcia* or the *Stone* court, in *Garcia* the court sum-

---

**5.** *United States v. Bachner,* 706 F.2d 1121 (11th Cir.1983), decided after *Garcia,* is not to the contrary. In *Bachner,* the court held that a remand was in order to determine if the defendant could show that he had standing to challenge the search of an airplane. In dicta, the court noted that if on remand such a showing could be made the burden would fall on the government to prove that the warrantless search was justified as a border search, and proceeded

to define the standard of proof authorizing a border search relying on the broad language in *Stone* that proof of a border crossing alone was sufficient.

It is clear from both *Garcia* and *Messersmith, supra,* that the *Garcia* court's rejection of the *Stone* dicta and formulation of the governing standard are holdings which are binding in all subsequent cases unless and until overruled or modified by this Court en banc.

marized the critical factors in addition to proof of a border crossing supporting the inference that the airplane's origin was foreign: "We follow *Stone* ... to the extent it held no further proof of foreign origin is required where an *unidentified* aircraft crosses the United States border." 672 F.2d at 1358 n. 12 (emphasis added).

Applying the *Garcia* standard to the facts of this case, we conclude, as did the district court, that the evidence here presented is virtually indistinguishable from that in *Stone* and *Garcia.* First, it is undisputed that Haley's airplane actually crossed the border. Second, prior to the border crossing Haley's airplane was sighted well outside the territorial limits of the United States traveling toward this country in a direction from a source area of illegal drug trafficking. Third, and critically, Haley's airplane was, at the time it crossed the border, unidentified both in the sense that he had failed to file a flight plan and in the sense that he did not announce his entry to the authorities, identify his aircraft, or state his point of origin or destination.[6] Fourth, and finally, the fact that Haley informed the Customs agents after his landing that his point of origin was southern Florida and that he had veered over the ocean to avoid a thunderstorm does not, as a matter of law and logic, preclude the Customs agents from reasonably inferring from the evidence in this case that there was a substantial likelihood that his point of origin immediately prior to

6. Haley claims that because he was flying VFR and was not required to file a flight plan, this factor may not be weighed against him. We disagree. There is no indication in either *Garcia* or *Stone* that the presence or absence of a government requirement that a flight plan be filed is determinative. Instead, the *Garcia* court emphasized that the government had made available a procedure by which domestic origin could be established and that one who failed to take advantage of this procedure would not be heard to later claim that his origin was domestic. In this case, the testimony at the evidentiary hearing revealed that the government had made available a procedure by which a pilot could fly VFR and file a flight plan revealing his origin and point of destination. The fact that Haley chose not to comply with this procedure does not change the fact that at the time he crossed the border his airplane was unidentified in the sense that no flight plan had been filed.

In a similar vein, Haley relies on the fact that the evidence revealed that he had contacted the Miami and Melbourne FAA flight service stations for an argument that the Customs agents knew that the origin of his flight was domestic, that he had veered out over the ocean to avoid a thunderstorm, and that he had made pilot reports identifying his airplane to the authorities. We first note that no evidence was presented at the suppression hearing to support Haley's claim that the FAA was informed as to the origin of his flight: the affidavit of the Melbourne service controller did not state that Haley identified his point of origin or destination, no testimony as to Haley's communications with Miami other than that he requested weather information was elicited, and Haley did not testify as to the content of his communications with the FAA. As to all three claims, we reject Haley's argument that the information possessed by the FAA should be imputed to the Customs agents as within the collective knowledge of the government. *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), cited by Haley, does not support this argument. Instead, the governing *Garcia* and *Messersmith* standard is clear that our focus is on what the Customs agents themselves knew prior to the time of the search, and not on the collective knowledge of the government as a whole. The Customs radar operator and the pilot of the Customs plane that first questioned Haley testified that they had no actual knowledge of Haley's reports to the FAA. Haley testified that he informed one of the Customs pilots of his contact with Melbourne after the search of his plane began. We hold that Haley's reports to the FAA do not change the fact that the information possessed by the Customs agents prior to the search was that his airplane was unidentified.

Finally, Haley attempts to distinguish *Garcia* on the ground that the regulations cited by the *Garcia* court requiring an airplane to identify itself on entry into the United States and to announce its point of origin and destination apply only to air traffic originating from Mexico or from or over other foreign locations. Leaving aside the fact that it is not at all clear, as Haley claims, that the Customs regulations relied on in *Garcia* are inapplicable to this case, *see* CFR § 6.2(b)(1) (1981), once again we hold that it is not the fact that Haley was not required to announce his entry that is dispositive in light of *Garcia,* but the fact that there was available some procedure by which he could announce his entry. As Customs Officer Allman testified at the suppression hearing, it is customary for pilots flying a VFR flight plan to be "squawking 1200 on your code in the aircraft." Haley did not do this, nor did he contact either Customs or the FAA at the time of his entry into this country.

the border crossing was other than in the United States. Since Haley's plane was unidentified at the time he crossed the border, we hold, as did the *Garcia* court, that he was "estopped from asserting a domestic point of origin after landing in this country." 672 F.2d at 1358. Stated differently, in light of the fact that Haley's plane was unidentified, the Customs agents were not bound to believe Haley's claim. And, even accepting this claim, both the Customs radar operator and the pilot of the smaller Customs plane that questioned Haley prior to the search testified at the suppression hearing that given an 8:05 a.m. departure time from Ft. Lauderdale Haley's airplane would have had time to fly to an island in the Bahamas, such as Bimini, land, take off and then reach the points at the times at which it was first sighted and it landed.

We therefore hold that the facts of this case as known to the Customs agents prior to the search of Haley's airplane reasonably supported an inference that there was a substantial likelihood that the origin of his flight was other than in the United States and, thus, that the warrantless search of his airplane was a valid border search.

AFFIRMED.