706 F.2d 1121
 UNITED STATES of America, Plaintiff-Appellant,
v.
Frank Edward BACHNER, a/k/a "Richard John Cassarella", a/k/a
"John Ryan", a/k/a "Jason", Defendant-Appellee.
 No. 81-6203.
 United States Court of Appeals,
Eleventh Circuit.
 June 6, 1983.
 
 Thomas A. Blair, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellant.
 Neal A. DuPree, Asst. Federal Public Defender, Miami, Fla., for defendant-appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before FAY and CLARK, Circuit Judges, and MARKEY*, Chief Judge.
 FAY, Circuit Judge:
 
 
 1
 The appellee, Frank E. Bachner, was charged in a four-count indictment (and later in a superseding indictment) with conspiracy to import methaqualone (quaaludes), conspiracy to distribute and possess with the intent to distribute methaqualone, importation of methaqualone, and possession with the intent to distribute methaqualone, in violation of 21 U.S.C. Sections 963, 846, 953(a), and 841(a)(1). The appellee pleaded not guilty to all of the counts in the indictment and subsequently filed a motion to suppress his post-arrest statements and certain evidence seized by United States Customs Patrol Officers at the time of his arrest. Adopting in part the magistrate's "Review and Recommendation," the district court issued an order suppressing most of the appellee's post-arrest statements and all of the physical evidence. The government appealed under 18 U.S.C. Section 3731.[1] After a careful review of the transcript of the suppression hearing, the magistrate's Review and Recommendation, and the district court's suppression order, we conclude that the trial court has not made a sufficient factual determination on the question of whether the appellee's fourth amendment rights were violated by the challenged search and seizure. We therefore remand this case to enable the trial court to determine whether the appellee had a legitimate expectation of privacy in the areas searched and items seized by the government.
 
 FACTS
 
 2
 On February 5, 1980, Customs Patrol Officer (CPO) James A. Howell received information from a confidential informant that a red, black, and white Piper Aztec aircraft, bearing number N5733Y and flown by John Ryan from Chicago, had left Vero Beach, Florida heading in a southerly direction. The informant told CPO Howell that the aircraft had only one seat and an illegal fuel tank, that Mr. Ryan had stated he was going "south for a load," that Mr. Ryan had inquired about the availability of fuel "down south," and that the aircraft was expected to return the following day.
 
 
 3
 CPO Howell subsequently checked available computer files but found no pilots named John Ryan from Chicago; FAA records revealed, however, that the aircraft was registered to William J. Retty of South Pasadena, California. Upon conferring with the FAA Miami Center, CPO Howell learned that the Aztec was not being tracked so he placed the aircraft on both local and FAA lookout status.
 
 
 4
 On February 7, 1980, United States Customs Patrol Officer Harold C. Briscoe, Jr., was flying in the vicinity of Fort Lauderdale at approximately 1:00 AM when he heard over Customs' radio a signal from an aircraft with partial call letters of "33 Yankee." Aware that the Aztec was on the lookout list, CPO Briscoe contacted his base and requested it to call Fort Lauderdale airport tower and obtain the aircraft's complete call letters. The tower responded that the aircraft's call letters were N5733Y, and it was an Aztec planning to land at North Perry Airport in Broward County. Upon being advised of the Aztec's complete call letters, CPO Briscoe diverted to North Perry Airport, where he saw the Aztec land and taxi to a parking area.
 
 
 5
 Shortly prior to these events, Customs officers in a radar equipped airplane patrolling in the vicinity of Bimini began tracking a target which was westbound from the vicinity of Bimini heading toward Fort Lauderdale at a speed of 140 to 150 knots. Another Customs airplane was launched to try to intercept the unidentified radar target, but after it got airborne, the radar patrol plane advised it that the target had been lost.
 
 
 6
 Following his landing at North Perry Airport, the appellee parked the Aztec at the south side of the airport and exited his aircraft where he was approached by Broward County Deputy Sheriff Michael Sokolowski, who had observed the Aztec land, taxi, and park. Deputy Sokolowski asked the appellee for identification and a pilot's license, but the appellee had neither. The appellee identified himself as Richard Cassarella.
 
 
 7
 Approximately ten minutes later, the Customs aircraft landed and taxied to Deputy Sokolowski's position, and CPO Briscoe got out of his aircraft. CPO Briscoe could see into the airplane's windows with his flashlight while he was standing on the ground outside the airplane. In addition to observing that the exterior of the airplane was dirty, he saw through the windows that there were boxes having "some kind of writing in Spanish on it," along with a wrist watch and aircharts. CPO Briscoe then stepped on the wing for a better look and saw that the chart was of the "South American area." CPO Briscoe asked the appellee if he could take a further look inside, and the appellee replied, "no," and closed the plane. With respect to the boxes in the airplane, CPO Briscoe observed that they were "virtually identical" to boxes seized a few days earlier from another aircraft which had been found to contain contraband. The boxes in the aircraft had the same "type of markings and bindings on them."
 
 
 8
 CPO Briscoe again asked the defendant for identification, he said he had none. Nor was he able to produce a pilot's license. When asked the origin and nature of his flight, the appellee stated that "he had departed Chicago, that he could not remember what airport he had departed from, and that he was transporting a cargo of car parts." Deputy Sokolowski placed the appellee under arrest on charges of operating an aircraft without a pilot's license. When the appellee was searched following his arrest, Deputy Sokolowski found one quaalude tablet in his pocket.
 
 
 9
 The appellee and CPO Briscoe went to an airport office where Customs telephoned the United States Drug Enforcement Administration (DEA). Upon being advised by his DEA office that an aircraft had landed at North Perry Airport and was suspected to be carrying narcotics, DEA Special Agent Avelino Fernandez traveled to the airport where he met with CPO Briscoe and Deputy Sokolowski. CPO Briscoe advised Agent Fernandez of the preceding events whereupon the officers went into the office, and the appellee was advised of his Miranda rights. The appellee then told the officers that he was not going to talk and that they would have to get a search warrant to search the Aztec.
 
 
 10
 Special Agent Fernandez told the appellee that they were going to search the Aztec; he then told CPO Briscoe in the appellee's presence to open the aircraft. CPO Briscoe obtained the key to the aircraft from the appellee; the appellee then stated that "the plane was loaded."
 
 
 11
 The aircraft was opened and searched. CPO Briscoe believed that the search was authorized as a border search. Agent Fernandez opened one of the boxes which had a small tear in the outer covering and observed white pills contained in clear plastic "sandwich" baggies which were later determined to be quaaludes. The agent observed that the aircraft contained two front seats and a rear bench seat, but the middle seats were missing and that area, as well as the baggage compartment, was filled with stacked boxes. After verifying that the first box contained quaaludes, the remaining boxes were unloaded and the aircraft was seized.
 
 
 12
 The appellee was then taken to the Fort Lauderdale DEA office, where, at Agent Fernandez's suggestion, he agreed to cooperate with the DEA. The appellee made one written statement and several oral statements implicating his non-appealing co-defendant, Fernando Galindo-Delvalle, who, the appellee stated, was going to provide the truck to transport the quaaludes. The appellee stated that he would be willing to arrange for Galindo-Delvalle to pick up the drugs. The appellee, wearing a body wire, met with Galindo-Delvalle twice that day, but Galindo-Delvalle failed to return later to pick up the drugs as he had agreed to do. The agents left the appellee at a hotel that night, and he was gone the next morning.
 
 
 13
 Since the agents had released the appellee before his true name was learned, he was subsequently indicted as "John Doe, a/k/a Richard John Casserella, a/k/a John Ryan." When his true name was ultimately discovered, a superseding indictment was then returned.
 
 Trial Court Proceedings
 
 14
 Prior to trial, the appellee filed a motion to suppress statements and physical evidence. The trial court referred these motions to the magistrate for a hearing which was held on July 29, 1981. Thereafter written memoranda were filed. In her Review and Recommendation to the court, the magistrate recommended that the appellee's motion to suppress statements and physical evidence be granted. As her recommendation of law, the magistrate adopted in its entirety the legal analysis contained in the memorandum of law submitted by the appellee.[2] The government filed timely objections to the magistrate's Review and Recommendation and requested a de novo hearing before the trial court. The trial court denied the government's request and with nothing further issued an order suppressing most of the appellee's post-arrest statements and all of the physical evidence.[3] From this order the government appealed.
 
 DISCUSSION
 
 15
 The appellee has maintained throughout this litigation that the search and seizure of the aircraft and its contents violated his fourth amendment rights.[4] Two requirements must be met before a person may successfully prevail on a fourth amendment claim. First, there must be a search and seizure of that individual's person, house, papers or effects, conducted by an agent of the government; stated differently, there must be an invasion of the claimant's reasonable expectation of privacy. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); United States v. Glasgow, 658 F.2d 1036, 1044 (5th Cir., Unit B, 1981). Second, the challenged search and seizure must be "unreasonable," as not all searches and seizures are proscribed by the fourth amendment, but only those that are "unreasonable." Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960). Both of the foregoing requirements are separate and distinct and both must be met before there can be any violation of an individual's rights guaranteed by the fourth amendment. Rawlings v. Kentucky, 448 U.S. 98, 112, 100 S.Ct. 2556, 2565, 65 L.Ed.2d 633 (1980).
 
 
 16
 The person who asserts his rights were violated under the fourth amendment has the burden of alleging and, if challenged, of establishing these requirements.[5] However, if the movant establishes an expectation of privacy and that the search and seizure took place without a search warrant, then the burden of proof shifts to the state to establish that an exception to the search warrant requirement was applicable in the subject case and that the search and seizure was, in fact, a reasonable one. Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1961); United States v. Harris, 479 F.2d 508, 509 (5th Cir.1973); Williams v. United States, 382 F.2d 48, 50 (5th Cir.1967).
 
 
 17
 Ordinarily, we would have no problem in concluding on this record that the appellee failed to establish the first fourth amendment requirement. Although clearly a governmental search and seizure took place in this case, it has not been established that the appellee's reasonable expectation of privacy was invaded.
 
 
 18
 The only evidence of record that goes to the "reasonable expectation of privacy" issue is the appellee's presence at the site where the aircraft was searched. At the suppression hearing, no evidence was adduced that the appellee had a reasonable expectation of privacy in the aircraft, as for example, that he owned or leased the subject aircraft or otherwise has an unrestricted right of occupancy or custody or control of said aircraft;[6] nor was any evidence adduced that the appellee had a reasonable expectation of privacy in the contraband seized, as for example, that he actually or constructively possessed the subject quaaludes, whether lawfully or unlawfully.[7] Rakas v. Illinois, United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). Absent such a showing, the fourth amendment requirement of a reasonable expectation of privacy was not established.
 
 
 19
 We cannot, however, dispose of this case on that ground because the record is incomplete. The development of a complete record was not due to the government's failure to challenge in the trial court the appellee's right to contest the subject search and seizure, Cf., Combs v. United States, 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972);[8] rather, full amplification was prevented by the exclusion of relevant evidence. At the outset of the hearing, the government's attorney rightfully requested that the magistrate, prior to the government introducing evidence relating to the lawfulness of the subject search and seizure, compel the appellee to comply with his burden of establishing his legitimate expectation of privacy in the area searched and items seized by the government. The magistrate denied the government's request and enigmatically asserted that " 'standing' is 'not necessarily a threshold question' and that this case 'does not appear to be one of those instances where the threshold question exists.' " The magistrate reserved ruling on the issue of whether the appellee had a legitimate expectation of privacy and, without any other mention of this threshold substantive question, went on to consider whether the subject search and seizure was "unreasonable." This approach conflicts with the decisional requirements delineated by the Supreme Court for successfully asserting a fourth amendment claim. As previously discussed, "ordinarily 'it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he ... establish, that he himself was the victim of an invasion of privacy.' " United States v. Salvucci, 448 U.S. 83, 86, 100 S.Ct. 2547, 2550, 65 L.Ed.2d 619 quoting Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697. And, this circuit has unequivocally stated that "[t]he threshold inquiry in a [f]ourth [a]mendment challenge is whether the challenger had a legitimate expectation of privacy in the invaded place." United States v. Glasgow, 658 F.2d 1036, 1044 (5th Cir. Unit B 1981); United States v. Hawkins, 681 F.2d 1343, 1344 (11th Cir.1982).[9] We find nothing in the facts of this case that would necessitate or justify a departure from this course.
 
 
 20
 Aside from arguing that a search warrant was not constitutionally required, "the [g]overnment was initially entitled to defend against [the appellee's] charge of an unlawful search by asserting that [the appellee] lacked a reasonable expectation of privacy in the searched [airplane and its contents]." Steagald v. United States, 451 U.S. 204, 209, 101 S.Ct. 1642, 1646, 68 L.Ed.2d 38. The appellee, the proponent of the motion to suppress, had the burden of establishing that his own fourth amendment rights were violated by the challenged search and seizure; and, the government's challenge to the appellee's right to assert a fourth amendment claim gave the appellee notice that he was to be put to his proof on any issue as to which he had the burden. Rakas v. Illinois, 439 U.S. at 128, n. 1, 99 S.Ct. at 421, n. 1, 58 L.Ed.2d 387. The appellee should have assumed his burden and established that a fourth amendment privacy interest personal to him was invaded when the government seized and searched the airplane and its contents, and the government should have been given a full opportunity to rebut the appellee's assertions of a privacy interest in the items seized. Then, the trial court should have made a factual determination on whether the appellee had a legitimate expectation of privacy in the aircraft and its contents. "Since there has not yet been any factual determination of whether [the appellee] had an interest in the [items or areas searched and seized]," Combs, 408 U.S. at 228, 92 S.Ct. at 2286, we must remand this case to the trial court.
 
 
 21
 If on remand the appellee can show that a fourth amendment privacy interest personal to him was invaded when the government seized and searched the airplane and its contents, then, and only then, does the burden shift to the government to prove its claim that the warrantless search and seizure falls within one of the specifically established exceptions as a border search.
 
 
 22
 Border searches constitute a well-hewn exception to the mandate of the fourth amendment. "Neither a warrant nor any level of suspicion is required to search vehicles, persons or goods arriving in the United States. Almeida-Sanchez v. United States, 413 U.S. 266, 272-73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). The rationale for this doctrine, which 'has a history as old as the fourth amendment itself,' United States v. Ramsey, 431 U.S. 606, 619, 97 S.Ct. 1972, 1981, 52 L.Ed.2d 617 (1977), is the fundamental necessity for national protection against unlawful entries from without." United States v. Stone, 659 F.2d 569, 572 (5th Cir., Unit B, (1981)). In furtherance of this crucial policy, the parameters of the doctrine have expanded to encompass searches far beyond the physical boundaries of the United States:
 
 
 23
 A border search need not take place at the actual border. It may be conducted at a place considered "the functional equivalent of the border," such as the port where a ship docks in this country after entering our territorial waters from abroad, United States v. Prince, 491 F.2d 655 (5th Cir.1974), or the airport where an international flight lands. United States v. Klein, 592 F.2d 909 (5th Cir.1979). United States v. Richards, 638 F.2d 765, 771 (5th Cir.1981).
 
 
 24
 Furthermore, a particular search may be the functional equivalent of a search at the border if the object of the search has been kept under constant surveillance from the border to the point of search. United States v. Johnson, 588 F.2d 147, 154 (5th Cir.1979).
 
 
 25
 Id. (emphasis in original).
 
 
 26
 In order for the government to invoke the border search exception in this case, it must prove that the airplane piloted by the appellee crossed an international border of the United States. In United States v. Stone, the former Fifth Circuit made it abundantly clear that if a border crossing can be established then a search at the border or its functional equivalent would be proper and appropriate, even though the origin of the aircraft has not been proven; stated differently "it is not necessary that the [aircraft] ... have been under actual observation from outside United States territory until its arrival and search." United States v. Ivey, 546 F.2d 139, 142 (5th Cir.1977). "Customs agents are entitled to draw reasonable inferences from circumstances and base their actions on common sense judgments." United States v. Messersmith, 692 F.2d 1315, 1320 (11th Cir.1982). As noted in Stone,
 
 
 27
 [i]n no case has a border search been invalidated because the object's departure from foreign soil was not demonstrated. Instead, a legion of cases have made clear that the propriety of a border search rests on the "critical fact" of whether or not a border crossing has occurred:
 
 
 28
 The critical fact is that the envelopes crossed the border and entered this country ... It is their entry from without that makes a resulting search "reasonable." United States v. Ramsey, 431 U.S. 606, 620, 97 S.Ct. 1972, 1981, 52 L.Ed.2d 617 (1977) (emphasis added).United States v. Johnson, 588 F.2d 147, 155 (5th Cir.1979).
 
 
 29
 659 F.2d at 573 (emphasis in original).
 
 
 30
 At the suppression hearing, after eliciting testimony from CPO Briscoe about the prior radar sighting of an aircraft in the Bimini area heading westbound at 140 to 150 knots towards Fort Lauderdale, the government's attorney sought to establish the link between this radar target and the airplane which the appellee landed a few minutes later. The appellee's attorney objected, stating that "there's been nothing in here to show that it's his plane or what plane it was" (R.Vol. 2 of 2, at 22); the magistrate sustained the objection.[10] We disagree with the magistrate's evidentiary ruling. Through its questioning of CPO Briscoe the government's attorney was trying to show that the airplane spotted on the radar was probably the airplane piloted by the appellee. Had the government been permitted to pursue its line of inquiry it might have demonstrated that the airplane detected by radar in Bimini heading towards Fort Lauderdale, was in fact the airplane piloted and subsequently landed by the appellee at the Broward County airport. Evidence tending to establish a nexus between the aircraft spotted on radar coming from Bimini and the airplane subsequently landed by the appellee in the United States should not have been excluded, since such evidence goes to the critical question of whether there was a border crossing. The government was entitled to offer evidence to show that the appellee had, in fact, crossed a border. Whether there has been a border crossing is a question of fact that needs to be determined on remand of this cause only after the appellee has proven that his own fourth amendment rights were violated by the challenged search and seizure.
 
 
 31
 The suppression order is vacated and the matter remanded for proceedings consistent with this opinion.
 
 
 32
 VACATED and REMANDED.
 
 CLARK, Circuit Judge, specially concurring:
 
 33
 I concur in vacating the district court's order which suppressed the evidence, but I would reverse and remand for trial. I disagree with the following statement in the majority opinion: "In order for the government to invoke the border search exception in this case, it must prove that the airplane piloted by the appellee crossed an international border of the United States." (Majority opinion at 1128.) Instead, I would hold that the government may make an inquiry of the pilot of any plane landing at a border point or its functional equivalent. Our court held in Stone: "Neither a warrant nor any level of suspicion is required to search vehicles, vessels, persons or goods arriving in the United States. Almeida-Sanchez v. United States, 413 U.S. 266, 272-73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973)." United States v. Stone, 659 F.2d 569 at 572 (5th Cir. Unit B 1981).
 
 
 34
 Determination of whether a plane is arriving in the United States is no easy task because of the apparent difficulty of discovering and tracking airplanes with electronic devices. Given that limitation, I would authorize the United States Customs officers to make an initial inquiry[1] of each pilot landing a plane at any airport within flying range of the border. That range would vary according to the type of plane. In the present case, such an inquiry was made. The responses disclosed that the pilot did not have identification, a pilot's license, nor evidence of the filing of a flight plan. Bachner stated that "he had departed Chicago, that he could not remember what airport he had departed from, and that he was transporting a cargo of car parts." As pointed out by the majority, a view through the aircraft window disclosed boxes, marked in Spanish, which were virtually identical to boxes containing contraband seized several days earlier from another aircraft.
 
 
 35
 My view does not contravene either United States v. Stone, 659 F.2d 569 (5th Cir. Unit B 1981) or United States v. Garcia, 672 F.2d 1349 (11th Cir.1982), both of which point out the uncertainty in the law of the old Fifth Circuit and the Eleventh Circuit with respect to the evidence required to prove a border crossing. Since there is no clear law on the subject, and since a private plane landing at a point within range of the border could easily have come from a foreign country, I conclude that the Terry type interrogation approved in United States v. Gollwitzer, 697 F.2d 1357 (11th Cir.1983) (See note 1) is not a violation of the Fourth Amendment.
 
 
 
 *
 Honorable Howard T. Markey, Chief Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 18 U.S.C. Section 3731 provides in relevant part:
 An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.
 The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.
 
 
 [2]
 After a lengthy recitation of the facts, the magistrate's Review and Recommendation reads as follows:
 RECOMMENDATIONS OF LAW
 Following hearing on the motions, the defendant, Frank Bachner, filed 'Defendant's Argument in Support of Motion to Suppress' on August 10, 1981. The Court has examined the defendant's pleading in great detail, and as the Court concurs with the legal analysis presented by the defendant's counsel, Federal Public Defender, Neal Dupree, and as the Court could not present any Recommendations of Law more succinct or more ably presented, the undersigned hereby adopts the legal argument of Mr. Dupree as the Recommendations of Law of the Court.
 Therefore, being fully advised, it is hereby
 RECOMMENDED that the Honorable Jose A. Gonzalez grant the Motion to Suppress filed by the defendant, Frank Bachner.
 
 
 [3]
 Although the government objects to the suppression of appellee's post-arrest statements, it has only raised on appeal the suppression of the physical evidence seized. Brief for the United States at 3, n. 3
 
 
 [4]
 The fourth amendment to the United States Constitution, as made enforceable against the states through the due process clause of the fourteenth amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."
 
 
 [5]
 "Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy." [emphasis added] Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697, 702 (1960), quoted with approval in Alderman v. United States, 394 U.S. 165, 173, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969)
 "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.... The prosecutor's argument [made in the trial court, challenging the accused's standing] gave petitioners notice that they were to be put to their proof on any issue as to which they had the burden...." Rakas v. Illinois, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978).
 
 
 [6]
 "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 1, ch. 1, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." Rakas v. Illinois, 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387 (1978)
 "[W]here the premises searched is the dwelling or is owned or rented by, or is in the possession of the accused, he has standing to attack the search. As employed in this connection we understand 'possession' to have reference to an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee." State v. Leveson, 151 So.2d 283, 285 (Fla.1963).
 The only evidence about the appellee's connection with the airplane established that the airplane belonged to someone other than the appellee. The aircraft was not searched until the appellee had flown it to its destination, parked and locked it, and had walked away. The extent to which a commercial pilot could have any reasonable expectation of privacy under these circumstances should have been expressly considered and ruled upon by the trial court.
 
 
 [7]
 The only evidence concerning the contents of the aircraft was the appellee's initial representation that the sealed boxes contained car parts that he had flown from Chicago. The appellee argues, however, that the white plastic bags around the suspected narcotics enclosed in sealed cardboard boxes evidenced a clear expectation of privacy in the narcotics. But according to the testimony at the suppression hearing one of the boxes had a tear in it which enabled the Customs officers to see inside of it. (R.Vol. 2 of 2, at 44). The United States Supreme Court has counseled that "[n]ot all containers and packages found by police during the course of a search will deserve the full protection of the [f]ourth [a]mendment. Thus, some containers (for example, a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to 'plain view,' thereby obviating the need for a warrant." Arkansas v. Sanders, 442 U.S. 753, 99 S.Ct. 2586, 2593-94, 61 L.Ed.2d 235 (1979). Thus, whether the appellee had a reasonable expectation of privacy in the contents of the sealed boxes when said contents could be determined by looking through the tear of one of the boxes is a factual determination that must be made by the trier of fact on remand of this cause
 
 
 [8]
 In Combs, the government had not challenged the [defendant's] standing at the suppression hearing and the issue of standing was not raised until the appellate level, where the [g]overnment conceded that its warrant was not based on probable cause. Because the record was virtually barren of the facts necessary to determine the [defendant's] right to contest the search and seizure, the [United States Supreme] Court remanded the case for further proceedings. 408 U.S., at 227 [92 S.Ct. at 2286]
 Rakas v. Illinois, 439 U.S., at 131 n. 1, 99 S.Ct. at 424 n. 1.
 
 
 [9]
 In Hawkins, we made the following observation:
 [T]he question has been raised as to when the defendant must demonstrate 'standing' to question the search, although a correct analysis will show that a focus on 'standing' is not now the proper approach to the ultimate question. After Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the proper analysis proceeds directly to the substance of a defendant's Fourth Amendment claim to determine whether the defendant had a reasonable and legitimate expectation of privacy in the article at the time of the search and consequently, whether the Fourth Amendment has been violated.
 
 
 [10]
 The relevant portion of the Suppression Hearing reads:
 Q. When you picked up the Piper Aztec, approximately what speed was it going?
 A. We did not get behind it. We got in contact with the Aztec just as he was landing at North Perry.
 Q. With relation to the timing of the Piper Aztec and the timing of the aircraft that was coming in from Bimini, do you have any conclusion as to whether or not--
 MR. DUPREE: I'll object to that, Your Honor. There's being nothing in here to show that it's his plane or what plane it was.
 THE COURT: I'll sustain the objection.
 Upon the conclusion of the suppression hearing, both sides were granted leave to submit supplementary memoranda. In its memorandum the government asserted, as a factor justifying a border search, that the appellee's airplane had been spotted on radar coming from Bimini. The response contained in the appellee's reply memorandum was that "[a]gain the record is devoid of any such 'factor.' " (R.Vol. 1 of 2, at 48). It appears that the only reason why the record is "devoid of any such factor" is because the magistrate excluded such evidence by sustaining the appellee's objection to the government's attempt to establish a link between the radar target sighting in Bimini and the appellee's airplane.
 
 
 [1]
 In United States v. Gollwitzer, 697 F.2d 1357 (11th Cir.1983), our court held that customs officers patrolling the Intracoastal Waterway on the east coast of Florida had the authority to stop a 42-foot boat capable of ocean travel to ask the boat's operators where they were coming from and who owned the boat. Our court held that unsatisfactory responses to such questions may provide a basis for the reasonable suspicion to board and search the boat. I find this case supportive of my position