UNITED STATES of America, Plaintiff,

v.

ONE ROCKWELL INTERNATIONAL COMMANDER 690 C/840, SERIAL NUMBER 11627, Defendant.

Civ. No. A3–82–66.

United States District Court,
D. North Dakota,
Southeastern Division.

June 29, 1984.

---

Gary Annear, First Asst. U.S. Atty., Fargo, N.D., for plaintiff.

Nicholas J. Spaeth, C. Nicholas Vogel, Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, N.D., for EMS Aviation, Inc. (claimant); Robert I. Targ, Pave & Targ, Peter Homer, Arky, Freed, Stearns, Watson & Greer; Miami, Fla., of counsel.

### MEMORANDUM AND ORDER FOR JUDGMENT

BENSON, Chief Judge.

On February 27, 1984, pursuant to a jury verdict, the court entered judgment that the defendant Rockwell International Commander 690 C/840, Serial Number 11627 be returned to the claimant, ESM Aviation, Inc. Presently before the court is the claimant's motion for an order enforcing judgment and the government's motion for reconsideration.

### Motion for Reconsideration

The United States has moved for reconsideration by the court of its September 6, 1983 ruling that the December 19–20, 1981 flight from Fort Lauderdale, Florida, to Fargo, North Dakota was conducted as a common carrier, in light of the evidence introduced at the trial of this case on the issue. Claimant ESM Aviation, Inc. (ESM) resists the motion on the bases that the motion is untimely under Rule 54(b) of the Federal Rules of Civil Procedure, and that the motion raises no new facts or legal authorities not already considered by the court in making its September 6, 1983 ruling.

### Timeliness of the Government's Motion

The court's September 6, 1983 order granted partial summary judgment pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. The court held "There is no genuine issue of fact remaining in this case for trial except the issue of privity. The subject aircraft was utilized for the flight in question as a common carrier...." *United States v. One Rockwell International Commander*, Civ. No. A3–82–66 at 8 (D.N.D. Sept. 6, 1983) (order granting partial summary judgment). Claimant argues that Rule 54(b) dealing with judgment upon multiple claims or involving multiple parties applies and makes the government's motion for reconsideration untimely.

Rule 54(b) provides in pertinent part as follows:

Where more than one claim for relief is presented in an action ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudi-

cates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties. ·

F.R.Civ.P. 54(b). This rule clearly applies when an action involves multiple claims or multiple parties. It, however, will not make partial adjudication of one of several claims final if it is not otherwise a final decision. *Nat. Corn Growers Ass'n, Inc. v. Bergland*, 611 F.2d 730, 732 (8th Cir. 1980).

▇▇▇ This lawsuit does not involve multiple claims or multiple parties. The complaint states a single claim of forfeiture against the defendant aircraft. The court's September 6, 1983 order granted partial summary judgment pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. Rule 56(d) clearly indicates that a partial summary judgment is not a final judgment and is therefore not appealable unless in the particular case some statute allows an appeal from the interlocutory order involved. There is no statute that permits an appeal from the order involved in this case. Therefore, the government's motion for reconsideration, having been made 10 days after the entry of judgment pursuant to jury verdict, was timely filed.

### Substance of the Government's Motion

The government argues in its motion for reconsideration that the evidence presented at trial revealed the flight and operation of the defendant aircraft were by Jimmy Jet International, Inc. and not Cav-Air, thus rendering the factual conclusions reached by the court in its September 6, 1983 order, and essential to the legal conclusion that the defendant aircraft was utilized as a common carrier, clearly erroneous. In support of its position the government cites the following facts established at trial:

1. Claimant ESM leased the aircraft to Jimmy Jet International, not Cav-Air.

2. The flight was conducted by Jimmy Jet, not Cav-Air.

The government contends that because Jimmy Jet was not certified by the FAA to conduct air charters, the flight, as a matter of law, was not a common carrier flight within the meaning of the forfeiture statute, 21 U.S.C. § 881(a)(4).

The evidence at trial leads this court to conclude that claimant ESM Aviation leased the aircraft to Jimmy Jet International and the December 19–20, 1981 flight to Fargo was conducted by Jimmy Jet, not Cav-Air. Jimmy Jet International was formed in Spring 1981 by James DeSalvo, Cav-Air's charter manager. Because it was losing money, Cav-Air's president, Keith Schnable, wanted to get out of the charter business. In September 1981 Cav-Air and DeSalvo entered into a verbal agreement whereby Jimmy Jet took over Cav-Air's charter business. Prior to September 1981, DeSalvo had been a salaried employee of Cav-Air. However, the verbal agreement provided that Jimmy Jet would use Cav-Air's facilities, arrange the charters and collect the money generated by them. Cav-Air was to receive 10% of the profits realized from the charters; Jimmy Jet was to retain the remaining 90%. Jimmy Jet was to pay the pilots and pay for fuel and maintenance at the airport.

Cav-Air owns no interest in Jimmy Jet, and according to the testimony of James DeSalvo, it is possible that Cav-Air didn't even know about Jimmy Jet when it was incorporated. Jimmy Jet likewise owns no stock in Cav-Air. The two corporations have no common officers or directors. In spite of the separate nature of these two corporations, however, James DeSalvo held Jimmy Jet out as a division of Cav-Air.

Prior to Jimmy Jet's taking over the charter business, DeSalvo had contacted FAA Inspector Jack Ervin about the proposed business relationship between Jimmy Jet and Cav-Air. DeSalvo apparently wanted to operate Jimmy Jet charter flights under Cav-Air's FAA air taxi certificate. DeSalvo was told by Ervin that Jimmy Jet could not advertise, but could collect the

money made on the charter flights. Additionally, Ervin told DeSalvo to keep everything else in Cav-Air's name. Consequently, Jimmy Jet did not advertise. However, DeSalvo had Jimmy Jet calling cards, stationary and charter request forms printed up, some of which indicated Jimmy Jet was a division of Cav-Air, some of which did not.

■ The defendant aircraft was leased by Jimmy Jet from ESM Aviation. Although the lease indicates that the lessee is Cav Air Inc./Jimmy Jet, the lease is signed by J. DeSalvo, President. James DeSalvo is president of Jimmy Jet. He holds no position whatsoever at Cav-Air. There is therefore no lease between ESM Aviation and Cav-Air, and likewise no lease between Cav-Air and Jimmy Jet.

Payments for the use of the defendant aircraft were made directly from DeSalvo to ESM Aviation. It was DeSalvo's understanding that it would be his responsibility to register the aircraft with the FAA, to check out the pilot and to notify the CAB about insurance. Apparently based on Ervin's representations, DeSalvo never did this.

Because the aircraft was leased by ESM Aviation to Jimmy Jet, the December 19–20, 1981 flight to Fargo was conducted by Jimmy Jet, not Cav-Air. The charter request was made on a Jimmy Jet Charter Request Form and arrangements for the flight were made by DeSalvo, president of Jimmy Jet. The court must therefore determine whether Jimmy Jet is a common carrier within the meaning of the forfeiture statutes.

■ As stated by the court in its September 6, 1983 order, the test in the Eighth Circuit for determining whether a carrier is a common carrier is as follows:

A carrier is a common carrier if it holds itself out to the public as willing to carry all passengers for hire indiscriminately. The holding out may be either by advertising or by actually engaging in the business of carriage for hire.

*United States v. One Rockwell Commander,* Civ. No. A3–82–66 at 6, quoting *Arrow Aviation, Inc. v. Moore,* 266 F.2d 488, 490 (8th Cir.1959).

It is clear that whether the flight is characterized as a Cav-Air flight or a Jimmy Jet flight, there was a holding out to the public of a willingness to carry all passengers for hire indiscriminately. Whether or not Jimmy Jet as a separate entity advertised, it actually engaged in the business of carrying passengers for hire.

The government, in arguing that an uncertified carrier cannot be a common carrier, relies heavily on the following language from a decision of the United States District Court for the Middle District of Florida:

Thus the rationale for the common carrier exemption revolves around nature and character of the carriage engaged in by the owner or master and the duties and responsibilities the law implies therein.

*United States v. One Liberian Refrigerator Vessel,* 447 F.Supp. 1053, 1062 (M.D. Fla.1977), *aff'd* 617 F.2d 136 (5th Cir.1980). The government contends that once the court has determined that the operator has held itself out to the public as willing to carry all passengers for hire indiscriminately, it must consider the duties and responsibilities the law implies for such an operator, including whether the operator is certified.

In *One Liberian Refrigerator Vessel,* the court found the failure of the carrier to file a schedule of rates or tariffs with the Federal Maritime Commission as required by law of every common carrier by water in interstate commerce, to be significant because although not precluding the court from finding the vessel was a common carrier, "it does indicate that the charteree did not intend to be within the ambit of the statute." *United States v. One Liberian Refrigerator Vessel,* 447 F.Supp. at 1064. Additionally, the United States Court of Appeals for the District of Columbia Circuit has held in the context of Federal Communication Commission regulations, that the key factor in determining the com-

mon carrier status of an operator is whether the operator offers "indiscriminate service to whatever public its service may legally and practically be of use." *Nat. Ass'n of Regulatory Utility Com'rs v. F.C.C.,* 525 F.2d 630, 642 (D.C.Cir.1976).

■ The failure of Jimmy Jet to comply with FAA and CAB regulations, at a minimum, makes Jimmy Jet an "illegal" common carrier. Whether considered a private carrier or an illegal common carrier, Jimmy Jet should not be permitted to take advantage of the common carrier exception to the forfeiture statutes. At common law the common carrier doctrine was developed to impose a greater standard of care upon carriers who held themselves out as offering to serve the public in general. The rationale was that by holding themselves out to the public at large, otherwise private carriers took on a quasi-public character. This character, coupled with the lack of control exercised by shippers or travellers over the safety of their carriage, was seen as justifying the imposition of the status of an insurer upon the carrier, and later their being subjected to price and service regulations as well.

As a matter of public policy it is the opinion of the court that a carrier should not be entitled to the benefits of common carrier status without accepting the burdens and responsibilities of it. In order to bring itself within the common carrier exception to the forfeiture statutes and reap the benefits thereof, it is necessary that the carrier comply with all laws passed to regulate the industry and insure the safety of the public. Because Jimmy Jet did not obtain a certificate from the FAA and did not comply with FAA and CAB regulations, it should not now be able to claim common carrier status. Additionally, its failure to comply with regulations governing common carriers indicates an intent on its part not to be within the ambit of the common carrier exception to the forfeiture laws. Therefore, although holding itself out to the public as willing to carry all passengers for hire indiscriminately, Jimmy Jet is not entitled to the benefits of the common carrier exception to the forfeiture statutes.

■ Because the flight was conducted by Jimmy Jet, and Jimmy Jet is either a private carrier or an "illegal" common carrier, in order to absolve the aircraft from culpability ESM must prove either that the aircraft was taken from it without its privy or consent (*i.e.* it had been stolen) or that it was uninvolved in and unaware of the wrongful activity, and had done all that reasonably could be expected to prevent the proscribed use of the aircraft. *See Calero-Toledo v. Pearson Yacht-Leasing Co.,* 416 U.S. 663, 689, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452 (1974). It is clear that the aircraft was not taken from ESM without its privy or consent. Therefore ESM's only possible defense is that it was uninvolved in and unaware of the wrongful activity, and had done all that reasonably could be expected to prevent the illegal use of the aircraft.

During the trial ESM presented evidence to the jury regarding its lack of involvement and knowledge of the illegal activity and its efforts to prevent illegal use of its aircraft. Based upon the evidence and the law, the jury found that ESM was not a consenting party or privy to the illegal transportation of drugs. Due to this finding, it was not necessary for the jury to consider ESM's innocent owner defense. Evidence regarding the defense had, however, been presented and at the close of the evidence the United States moved for a directed verdict on this issue, which the court denied.

■ Based upon the evidence presented at trial it is the opinion of the court that although ESM established its lack of privy or consent, which is substantially the same as its being uninvolved in and unaware of the illegal activity, it failed to prove that it had done all it reasonably could to prevent the illegal transportation of drugs. At trial Jack Ervin, FAA principal operations inspector for Cav-Air from 1979–80, testified as to measures taken in the industry by aircraft owners to prevent the illegal

use of aircraft. According to Ervin these include the checking of certificates and possible FAA violations by operators, and the creation of policies. The testimony of Thomas Stokes, the chief pilot and chief operating officer of ESM, indicated that in this case he had talked to DeSalvo about making sure that the FAA and CAB regulations were complied with and had provided him with the necessary paperwork. He additionally relied on Cav-Air's good business reputation.

Although it is not practically possible for a representative of an aircraft owner to be on board every flight to make sure that drugs are not being smuggled on the aircraft, it is the opinion of the court that the modest efforts of ESM in this case fall short of all reasonable efforts to prevent smuggling. The aircraft was based at an airport in an area of the country that is well known for drug related activities. In fact, the evidence presented at trial indicated that several drug related arrests had been made at the Fort Lauderdale airport. These facts alone required a higher standard of investigation than was employed by ESM with regard to the defendant aircraft. However, ESM apparently had no plan or procedures for detecting smuggling, and did not require any of the aircraft operator. Because it apparently lacked any precautions to prevent illegal use of the aircraft, ESM failed to establish its innocent owner defense. The government's motion for directed verdict should therefore be granted.

IT IS ORDERED that the United States' motions for reconsideration and directed verdict are granted.

IT IS FURTHER ORDERED that judgment be entered declaring that ESM Aviation, Inc. has no further right, title or interest in the Rockwell International Commander 690 C/840, Serial Number 11627, seized incident to the arrest of Fred McConeghy, Buford Higgs, and Alex Tindall, and that pursuant to 21 U.S.C. § 881 and 49 U.S.C. § 782, the aircraft be forfeited to the United States.