**UNITED STATES of America, Plaintiff,**

v.

**ONE (1) BLUE LOBSTER VESSEL NAMED TONY, JR., OFFICIAL NO. 559940, With its Tackle, Apparel & Equipment, Defendant.**

No. 84–2398–Civ.

United States District Court,
S.D. Florida.

April 21, 1986.

Samuel D. Armstrong, Asst. U.S. Atty., Miami, Fla., for United States.

Arthur Newman, Miami, Fla., for defendant.

## MEMORANDUM OPINION
## UNDER RULE 52

ATKINS, District Judge.

This cause was tried to the court without a jury on February 18, 1986. Plaintiff, United States of America, seeks civil forfeiture of the defendant vessel (Tony Jr.) pursuant to 21 U.S.C. § 881, 49 U.S.C. § 782, 19 U.S.C. § 1595a(a), and 19 U.S.C. § 1703. The court has reviewed the pleadings and heard the testimony of the witnesses, made determination as to the credibility of the witnesses presented, considered the evidence, and heard argument of counsel. On the basis thereof, the court concludes the

subject vessel, the Tony Jr., is subject to forfeiture.

## Jurisdiction

The court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

## Procedural Background

The parties are in agreement that the following correctly reflects the procedural background:

Plaintiff, United States of America, filed a complaint for forfeiture in rem on October 10, 1984. In its complaint, the United States alleges that on or about March 20, 1984, officers of the United States Customs Service seized the defendant vessel and that the vessel was used or was attempted to be used to facilitate the transporation, carriage, conveyance, concealment, receipt or possession of marijuana in the United States.

Claimant, Oscar Aldarondo, filed his answer and affirmative defenses, alleging an interest in the defendant vessel as its lawful owner, and denying knowledge of or any connection with the alleged illegal activities relating to the defendant vessel.

Claimant also filed a crossclaim. Both the United States and the claimant have stipulated in open court that the crossclaim should be dismissed if the court rules that the subject vessel is forfeited to the United States, and to defer further proceedings on the crossclaim pending the court's determination as to forfeiture.

## Information from Confidential Informant

On March 10, 1984, a lookout coordinated by the El Paso Information Center (EPIC) was initiated for the Tony Jr. This lookout resulted from information received by United States Customs Officer Lawrence E. Winberg from a confidential informant. The latter had proved to be reliable on prior occasions. The confidential informant provided information that the Tony Jr. and two other boats were to be used to pick up loads of marijuana in the vicinity of the Bahama Islands and transport that marijuana to the United States. Prior to the boardings of the Tony Jr., described below, the other two boats were seized with large quantities of marijuana on board.

## The Earlier Boarding

On March 18, 1984, officers of the United States Coast Guard assigned to the ship Sea Hawk boarded and inspected the Tony Jr. approximately 20 nautical miles northwest of Cayo Lobos in the area of the Great Bahamas Bank. The Coast Guard boarding party observed that no fish, oversize tanks, fishing tackle, fishing equipment, lobster pots, trap puller, or ice for storage of fish was on board the Tony Jr. Although the captain of the Tony Jr., Manuel Portillo, informed the Coast Guard that the boat was being used for fishing, he had no explanation for the absence of fish, fishing tackle, fishing equipment and ice for storage of fish. The documents were in order. Finding no violations, the vessel as released. The location where the boarding of the Tony Jr. took place was known to the Coast Guard as a "hot spot" for trafficking of marijuana and other drugs.

The Coast Guard notified EPIC about the boarding of the Tony Jr. and informed EPIC that, based upon the observations and information delineated in the proceeding paragraph, it appeared that Tony Jr. would be receiving a shipment of marijuana. EPIC immediately disseminated this information to the Customs Service.

## The Arrival at Marathon

On March 20, 1984, the Customs Service received a telephone call from an anonymous person who stated that a "suspicious boat" had just docked in a marina at Marathon Island, and that the people on board the boat had hastily left. Customs officers and detective personnel from the Monroe County Sheriff's Office immediately proceeded to the marina to investigate, and upon arrival learned that the "suspicious

boat" was the Tony Jr. No one was on board the boat when they arrived.

### The Marathon Boarding

The Customs officers, one of whom was Officer Winberg, boarded the Tony Jr. and proceeded to perform a documents inspection. The boat's documents were located in the wheelhouse and found to be in order. Upon entering the wheelhouse, the odor of marijuana was detected by the boarding party. The officers also noticed the absence of any fish, fishing tackle, fishing equipment and ice for storage of fish.

As part of the Customs Service's standard procedure, the Customs officers proceeded to the engine room of the Tony Jr. in order to verify that the identification number located on the mainbeam of the boat corresponded with the number indicated on the documents found in the wheelhouse.

In proceeding to and upon entering the engine room, marijuana residue was observed by the Customs officers. Accordingly, a search of the Tony Jr. was conducted and 14 grams of marijuana was gathered. Marijuana residue was found throughout the engine room and hold of the vessel, and was distributed in a manner which indicated to Officer Windberg that a large quantity of marijuana had been stored in the Tony Jr. The boarding officers observed that the vessel's engines were still warm, indicating that the boat had recently arrived at the dock.

Officer Winberg performed a field test on the gathered residue which tested positive, confirming that the residue was from marijuana. Officer Winberg had previously received training in performing marijuana field tests. He had conducted approximately 500 such tests prior to his boarding the Tony Jr.

Neither Manual Portillo, the captain of the Tony Jr., nor anyone else associated with the Tony Jr., reported its arrival into United States territory to the Customs Service or any of the governmental stations which ordinarily receive such notifications.

### Prior Seizures of the Tony Jr.

The Tony Jr. was seized on two occasions prior to the March 20, 1984 seizure. In 1979, the Tony Jr. was seized with over 15,000 pounds of marijuana on board, and the boat was seized during the Mariel boatlift for illegally transporting aliens. On both occasions the Tony Jr. was seized while being used by someone to whom claimant had rented the boat.

### The Claimant's Testimony

Claimant, Oscar Aldarondo, testified at the trial. Among other matters he stated:

(a) He purchased the Tony Jr. in 1978 for $48,900.00. The entire purchase price was satisfied with cash payments made from 1978 through 1981. He made a down payment of $17,000 on the purchase price and the balance of $38,900.00 was paid from proceeds received by him from rentals of the Tony Jr.

(b) Aldarondo received a $50,000.00 loan in 1979 which was satisfied solely from cash payments. The full $50,000.00 was paid with proceeds received by claimant from renting the Tony Jr.

(c) Aldarondo charged approximately $1500.00 each time he rented the Tony Jr. and rented the boat on approximately six to seven occasions during the entire time he owned the Tony Jr.

### The Claimant's Credibility

Claimant's testimony as to the payment of the purchase price, payment of the above loan, and rental income from Tony Jr. is not credible. He contends he made cash payments of $88,900.00 from rental proceeds, yet claimant admits that rentals for the entire time he owned the boat did not exceed $14,500.00 ($1500 × 7 rentals).

Prior to the March 20, 1984, seizure of the Tony Jr., claimant had rented the boat to Manuel Portillo, who had purportedly taken possession of the boat in early February, 1984. Portillo was expected to retain possession of the boat for several months.

## Claimant's Admissions

Claimant Aldorando has admitted the following:

(a) He received income from boat rentals in 1981, 1982 and 1983. However, the income tax returns signed and filed by Aldorondo for those years do not report any income from rentals of the Tony Jr. In fact, Aldarondo has never reported to the Internal Revenue Service the income he received from renting the Tony Jr. during 1981, 1982 and 1983.

(b) Aldarondo never required nor used any type of written agreement or contract when he rented the Tony Jr.

(c) Aldarondo never required a security deposit when he rented the Tony Jr.

(d) Aldarondo had no insurance on the Tony Jr. when it was seized on March 20, 1984.

(e) At the time Aldarondo rented the Tony Jr. to Portillo, the former knew Portillo only as "Manola." Aldarondo did not know either Portillo's last name or his address prior to renting him the boat.

(f) The only information Aldarondo had as to Portillo prior to renting him the Tony Jr. were the statements of several fishermen that Portillo was also a fisherman but Aldarondo did not know the names of these fishermen or anything about them.

(g) When Aldarondo rented the Tony Jr. to Portillo, claimant did not know on what date Portillo would return with the boat. He only knew that Portillo would be returning "in one or two months."

(h) Aldarondo did not require and did not receive a security deposit or any rental money from Portillo prior to Portillo's departure with the Tony Jr.

(i) Claimant had no written rental agreement or contract with Portillo. The only agreements claimant had with Portillo were verbal understandings.

(j) Claimant did not ask where Portillo would be taking the Tony Jr., but assumed he would be taking the boat to commonly used fishing grounds in the vicinity of the Bahama Islands.

(k) When not being rented, claimant kept the Tony Jr. docked on the Miami River at the business address of a man named Billo. Claimant, however, does not know Billo's last name. Prior to docking his boat at Billo's place, claimant would dock his boat in an area on the Miami river, the owner of which claimant does not know.

## Claimant's Contentions

Oscar Aldarondo is the registered and lawful owner of the 48'8" vessel, Tony Jr., described as a 1978 Defender, Official Number 559940. The appraised value of the vessel is $55,000.00. He acquired legal title and possession to the Tony Jr. on or about the 25th day of October, 1982, and is a permanent resident of Dade County, Florida.

The Tony Jr., Aldarondo contends, was purchased by him for the sole purpose of pleasure use and fishing, and has never been used by him or intended for use by him for any illegal purpose.

The amount of marijuana on the Tony Jr. constitutes a misdemeanor under applicable statutes. No individual or individuals were charged or arrested in connection with the seizure.

At the time of the boarding, inspection and subsequent seizure, there were no persons aboard the Tony Jr. having any interest in the vessel or the property contained within the vessel.

Aldarondo testified that it was customary in the area for fishermen to rent out their boats in an informal arrangement whereby leases and deposits were not required. Prior to renting the boat to Portillo, Oscar Aldarondo inquired as to the reputation of Portillo of other fishermen friends in the area, well known to Aldarondo.

There is no evidence Aldarondo had direct knowledge that any person who may have at any time used, worked on board, or have been aboard the Tony Jr. had or may have had a criminal record or reputation for any suspicion of crime dealing with the

sale, possession, or use of any illegal drugs or controlled substances.

Aldarondo had no knowledge that the vessel was used to transport contraband and was told by the lessees of the boat that rental of the boat was for fishing only. He went to the dock one week after renting the boat to verify that fishing equipment was put on the Tony Jr. This was on approximately February 3rd or 4th, 1984. The Coast Guard found no false compartments on board the Tony Jr.

### Conclusions of Law

■ 1. In order to establish a forfeiture in this action, the government must show there was probable cause that one of the statutes under which the government is proceeding has been broken. *United States v. One (1) 1982 28' International Vessel,* 741 F.2d 1319, 1321 (11th Cir.1984).

■ 2. Probable cause in this context is defined as a reasonable ground for a belief of guilt, supported by less than prima facie proof but more than mere suspicion. *United States v. One 1979 Porsche Coupe,* 709 F.2d 1424, 1426 (11th Cir.1983); *United States v. One 1978 Chevrolet Impala,* 614 F.2d 983, 984 (5th Cir.1980).

■ 3. When the Tony Jr. was boarded by United States Customs officials on March 20, 1984, fourteen grams of marijuana residue were discovered. This residue was found scattered throughout the engine room and hold of the vessel and was distributed in a manner which indicated that a large amount of marijuana had been stored in the Tony Jr. Customs Officer Lawrence E. Winberg performed a field test on the residue which proved positive, establishing that the residue was from marijuana. The presence of marijuana in the Tony Jr., which had traveled from international waters into United States territory sometime between March 18 and March 20, 1984, establishes that the vessel faciliated the receipt, possession and concealment of a controlled substance and contraband article

in violation of 19 U.S.C. §§ 1595a, 21 U.S.C. § 881 and 49 U.S.C. § 781.

4. "There can be no question that marijuana constitutes contraband," and a vessel is subject to forfeiture no matter how small the quantity of contraband found. For purposes of forfeiture, positive results in a field test furnished sufficient proof as to the existence of contraband." *28' International Vessel,* 741 F.2d 1322. The court therefore concludes that the United States of America has met its burden of establishing probable cause for the seizure of the Tony Jr. and the commencement of this forfeiture action.

■ 5. The boarding of the Tony Jr. after it docked at Marathon Island, was under the imprimatur of 19 U.S.C. § 1581(a),

> Customs officers may board any vessel at any place in the United States without suspicion in order to do a document or safety check when the vessel is located in waters offering ready access to the open sea.... the mooring to a private dock is not important; it is access to the open sea that is determinative.

*United States v. One 1972 44' Striker, Bonanza,* 753 F.2d 867, 868 (11th Cir.1985), *citing United States v. Villamonte-Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). The boarding of the Tony Jr. by Customs was well within the authority granted by § 1581(a).[1]

■ 6. The entry of the customs officers into the engine room, and subsequent search of the engine room and hold of the vessel was not an unreasonable search, since it is clear that there exists no Fourth Amendment privacy interest in such areas of a boat. *United States v. Manbeck,* 744 F.2d 360, 384, n. 37 (4th Cir.1984); *United States v. Bent,* 707 F.2d 1190, 1193 (11th Cir.1983); *United States v. Stuart-Caballero,* 686 F.2d 890, 892 (11th Cir.1982); *United States v. DeWeese,* 632 F.2d 1267, 1271 (5th Cir.1980).

---

1. The boarding of the Tony Jr. by the Coast Guard on March 18, 1984 was also well within the authority of the United States Coast Guard under the analogous statute 14 U.S.C. § 89(a).

7. The Fourth Amendment does not inhibit entry into the hold of a vessel to check the identification number on the beam. This is part of the standard procedure incident to a documents check that may be performed by the Customs officers. As noted above, such documents checks conducted under 19 U.S.C. § 1581(a) may be performed "without suspicion." *United States v. Villamonte-Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983); *One 1972 44' Striker, Bonzanza*, 753 F.2d at 868. Under a similar statute providing authority for document checks by the Coast Guard, 14 U.S.C. § 89(a), it has been held that:

> ... the Coast Guard may ... go into the hold of the vessel to check the vessel's main-beam identification number.... Such a 'search' ... requires no suspicion that the intrusion into the hold will result in the discovery of any contraband or evidence of wrongdoing.

*United States v. Thompson*, 710 F.2d 1500, 1507 (11th Cir.1983); *United States v. Williams*, 617 F.2d 1063, 1086 (5th Cir.1980). Since 14 U.S.C. § 89(a) has been held to be analogous to 19 U.S.C. § 1581(a), *United States v. Alonso*, 673 F.2d 334, 336 (11th Cir.1982). Under *Williams* it is settled that in performing their documents inspection of the Tony Jr. the customs officers needed no suspicion prior to entering the engine room. Once in the engine room, the marijuana residue was in plain view.

8. The search of the Tony Jr. also qualifies as a border search. "Border searches constitute a well-hewn exception to the mandate of the fourth amendment." *United States v. Bachner*, 706 F.2d 1121, 1128 (11th Cir.1983). "Neither a warrant nor any level of suspicion is required to search vehicles, persons or goods arriving in the United States." *United States v. Stone*, 659 F.2d 569, 572 (5th Cir.1981), citing *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). Border searches need not take place at the physical boundaries of the United States, so long as it is conducted at the functional equivalent of the border.

> A border search need not take place at the actual border. It may be conducted at a place considered 'the functional equivalent of their border,' such as the port where a ship docks in this country after entering our territorial waters from aboard.

*Bachner*, 706 F.2d at 1121, *quoting United States v. Prince*, 491 F.2d 655 (5th Cir. 1974).

9. In establishing a border search, while it is necessary to prove that an international border has been crossed, "it is not necessary that the [vessel] have been under actual observation from outside United States territory until its arrival and search." *Bachner*, 706 F.2d at 1121, *quoting United States v. Ivey*, 546 F.2d 139, 142 (5th Cir.1977).

> A border search may be conducted away from the actual border if (1) there is a reasonable certainty that the object of the search has just crossed the border, (2) the search takes place at the first practicable point after the border was crossed and (3) there has been on time or opportunity for the object of the search to have changed materially since the time of the crossing.

*United States v. Carter*, 760 F.2d 1568, 1576 (11th Cir.1985). In determining whether a border search is appropriate, "Customs agents are entitled to draw reasonable inferences from circumstances and base their actions on common sense judgments." *Bachner*, 706 F.2d at 1121, *quoting United States v. Messersmith*, 692 F.2d 1315, 1320 (11th Cir.1982).

10. The inference can be drawn that the Tony Jr. crossed the border into United States territory, since it was boarded March 18, 1984 in international waters, and boarded March 20, 1984 while docked at Marathon Island in the Florida Keys. There were other indicia of recent crossings into the United States. Customs had an ongoing look-out for the Tony Jr. and first spotted it March 20, 1984. None of those associated with the vessel reported

its entry into United States territory.[2] The boat engines were warm at the time of boarding. These support the conclusion that the Tony Jr. had crossed into the United States shortly prior to its arrival at Marathon. A border search was appropriate.

11. Probable cause existed for the search of the Tony Jr. As above recited, Officer Winberg had received information from a confidential informant that the Tony Jr. along with two other boats were to be used for transporting marijuana. This confidential informant had proved reliable and accurate in the past, and the above information had proved reliable as the two other boats named with the Tony Jr. were seized with marijuana on board prior to the boarding of the Tony Jr.

12. A warrantless search requires a reasonable suspicion, *United States v. Kent,* 691 F.2d 1376 (11th Cir.1982) *cert. denied,* 462 U.S. 1119, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983), and a tip from a known, proven informant can justify a reasonable suspicion of criminal activity. *Id.* at 1379. In addition, reasonable suspicion was provided by (a) the absence of the fish, fishing equipment or ice for storage of fish, (b) the failure of the captain of the Tony Jr. to report the arrival of the vessel into the United States, and (c) the odor of marijuana detected upon entry into the wheelhouse.

13. Once the government has established probable cause for forfeiture, the burden of proof shifts to the claimant to prove a defense. *United States v. One 1975 F100 Pick-up Truck,* 558 F.2d 755, 756 (5th Cir.1977); *United States v. One 1971 Chevrolet Corvette Automobile,* 496 F.2d 210, 212 (5th Cir.1974); *United States v. One (1) 30 Foot 1982 Morgan Vessel,* 597 F.Supp. 589, 591 (M.D.Fla.1984). The claimant must prove a defense by a preponderance of the evidence. *Ford F100 Pick-up Truck,* 558 F.2d at 756. In this action, claimant has raised as an affirmative defense his claim of being innocent of any wrongdoing associated with the Tony Jr.

14. "Innocence [of the claimant], in and of itself, is an insufficient defense to forfeiture," *United States v. One (1) 1957 Rockwell Aero Commander 680 Aircraft,* 671 F.2d 414, 417 (10th Cir.1982). To prevail on the defense of innocence, a claimant must establish that "he had done all that reasonably could be expected to prevent the proscribed use of his property." *28 Foot International Vessel,* 741 F.2d at 1322; *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 689, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452.

15. In determining the standards for failure to do "all that reasonably could be expected to prevent the proscribed use of his property," courts have given weight to such factors as failure to determine where the claimant's property was to be taken, *United States v. One 1983 Pontiac Gran Prix,* 604 F.Supp. 893, 897 (E.D.Mich.1985); failure to require a written contract when renting, *United States v. 1966 Beachcraft Aircraft Model King Air,* 777 F.2d 947, 950 (4th Cir.1985); failure to obtain a clear understanding as to when property would be returned, *Id.;* failure to require money from a renter prior to turning over possession of property, *Id.;* and failure to carry insurance on the property, *United States v. (1) 30 Foot 1982 Morgan,* 597 F.Supp 589 (M.D.Fla.1984). Additionally, courts have held that in determining whether a claimant has acted reasonably it is significant if the subject property is being used in the South Florida area, since this is "an area of the country that is well known for drug related activities." *United States v. One Rockwell International Commander 690 C/840,* 594 F.Supp. 133, 139 (N.D.N.Dak.

---

**2.** 19 U.S.C. § 1433 requires that

within twenty-four hours after the arrival of any vessel from a foreign port or place ... at any port or place within the United States at

which such vessel shall come to, the master shall ... report the arrival of the vessel at the nearest customhouse.

1984); *1966 Beachcraft Aircraft Model King Air,* 777 F.2d at 951.

16. In determining whether claimant, Oscar Aldarondo, did "all that reasonably could be expected to prevent the proscribed use" of the Tony Jr., the court must consider the fact that claimant never required a written contract when renting the Tony Jr., never required a security deposit, had no insurance on the boat, did not know the last name or address of the man who was renting the Tony Jr. when it was seized, did not require that the renter pay any money prior to taking possession of the boat, did not inquire as to where the renter would be taking the boat, did not set any time for the return of the boat other than "in one or two months," and did not know the last name of the owner of the dock where claimant kept the Tony Jr. moored.

17. Additionally, claimant should have been aware that boats are commonly used in South Florida for transporting illegal drugs, especially since the Tony Jr. had already been seized once before in 1979 for transporting marijuana while being rented from claimant.

18. The court also considers it significant that claimant has filed tax returns with the Internal Revenue Service but has never reported the income claimant has received from renting the Tony Jr.

19. In light of the elements set forth above, it is apparent that claimant Aldarondo did not do "all that reasonably could be expected to prevent the proscribed use of his property." Indeed, it appears that claimant was consciously indifferent as to how the Tony Jr. was used. Accordingly, the court holds that claimant was not an "innocent owner" under *Calero-Toledo.*

20. Based upon the foregoing, the court concludes that the Tony Jr. is subject to forfeiture for violations of 19 U.S.C. §§ 1595a and 1703, 21 U.S.C. § 881, and 49 U.S.C. § 781, and that the United States is entitled to a final judgment of forfeiture.

The crossclaim is dismissed with prejudice.