UNITED STATES of America, Plaintiff,

v.

ONE (1) 1984 # 1 BOAT MFG. LOBSTER VESSEL KNOWN AS M/V SEA POWER OFFICIAL DOCUMENTATION NO. 675336 together with its tackle, apparel and equipment, Defendant.

No. 85–0747 Civ.

United States District Court, S.D. Florida.

Sept. 7, 1985.

David Lichter, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Jorge Sibila, Miami, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, Chief Judge.

THIS CAUSE came before this Court for a non-jury trial on September 3, 1984. Plaintiff, United States of America, seeks civil forfeiture of the defendant vessel, pursuant to 21 U.S.C. § 881, 49 U.S.C. § 781, 19 U.S.C. §§ 1595a(a) and 1703.

The Court, having heard the testimony of the witnesses, having considered the evidence and having made determinations of credibility of the witnesses presented, enters the following findings of fact and conclusions of law.

### JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

### PROCEDURAL BACKGROUND

Plaintiff, United States of America, filed a Complaint for Forfeiture In Rem, alleging that on October 3, 1984, officers of the United States Customs Service seized the defendant motor vessel; that said motor vessel was used or was intended to be used to transport or to facilitate the transportation, receipt, possession or concealment of marijuana into the United States, and that a secret compartment for the purpose of smuggling was built into the defendant vessel.

Claimant, Alberto Napoles, filed his Answer to Complaint for Forfeiture In Rem, alleging an interest in the defendant vessel as its lawful owner. Claimant denied any knowledge of the defendant vessel's alleged illegal activities and denied that a secret compartment had been built into the vessel.

### FINDINGS OF FACT

1. On September 17, 1984, the SEA POWER was placed on lookout by Customs Officer Harris, following information obtained from a previously reliable and accurate confidential informant that the vessel had departed Key West, Florida, to Jamaica, to pick up a load of marijuana. The

informant also stated that the SEA POW-ER would return to the southeastern United States.

2. On October 3, 1984, Florida Marine Patrol Officers Frankel and Sharp—who knew that vessel was on lookout and who had previously seen the SEA POWER under construction prior to its departure—spotted the vessel being lifted out of the water at the Peninsula Boat Yard on Stock Island at Key West, Florida.

3. Officers Frankel and Sharp contacted the Key West Customs Tactical Enforcement Division Office and notified it of their observations. That office then dispatched Special Customs Patrol Officer Cooper and Customs Patrol Officer Gagliardi to the boat yard.

4. Those officers, who had between them numerous years of marine experience, including experience with vessel maintenance and construction, observed the vessel's bottom to be clear of bottom growth and free of any outward appearance of structural damage to the keel, propeller, rudder, shaft or any other outside portion of the vessel. Through Cooper, Gagliardi's and Frankel's past boating experience, they believed that something was amiss, because there was no apparent reason to haul the vessel.

5. As Cooper and Gagliardi approached the vessel, Yard employee Dan Gatewood asked them if he could be of any assistance. Cooper and Gagliardi identified themselves as U.S. Customs Officers and told Gatewood they were interested in the vessel SEA POWER. Gatewood stated that he had lifted the vessel from the water that afternoon for Pete Rodriguez. Cooper asked Gatewood why Rodriguez had hauled his boat. Gatewood stated that Rodriguez had told him that he wanted the boat lifted because he had been adrift at sea for seventeen days and wanted to get to Miami. Rodriguez also asked Gatewood to watch the boat and not allow anyone to board it. Rodriguez said he would return in a few days.

6. Upon boarding the SEA POWER, Officer Frankel noticed an almost complete absence of the type of fishing gear that would be aboard a fishing vessel like the SEA POWER, such as extra fishing line, buoys, gloves, or hooks. A routine inspection of the vessel's fish had revealed that the fish hold—based upon the officer's past boating experience—appeared smaller than those of vessels of a similar size. Through Cooper and Gagliardi's knowledge of the type of vessels built in the Key West area, they knew that the builders utilize all available space for fish hold compartments. Measurements were taken of the inside of the fish hold by Cooper and Gagliardi. It was found to be 8'8" from the aft bulkhead of the ice hold to the forward bulkhead.

7. The officers then looked through the cabin door window and observed the main cabin uppermost deck to appear longer than the measurements obtained in the fish hold. Cooper and Gagliardi then found the cabin door to be unlocked. They then went inside and measured the space from the aft fish hold bulkhead to the forward bulkhead. Their measurements totaled 10'8", thus leaving two feet of available space which was unaccounted for.

8. Cooper, Gagliardi and Frankel then went down the stairway to the forward cabin area. In plain view, Cooper and Gagliardi observed several marijuana seeds on the steps of the stairway. The officers also noticed that the stairway has been freshly painted and saw footprints in the drying paint. A further search of the forward deck and bunk area revealed additional marijuana seeds and stems. Cooper field-tested a portion of the residue, which tested positive for THC content, the active ingredient in marijuana.

9. The officers then removed the stairway ladder, which was against the forwardmost bulkhead of the vessel. As the officers faced the forwardmost bulkhead, what appeared to be a shower was to their immediate right. An inspection of the shower area revealed tile paneling on the shower walls, and finish molding strips nailed with matching paneling nails on all walls, except on the paneling nailed to the forwardmost bulkhead. That particular

paneling was nailed down with common, unfinished nails. In addition, the shower wall of the forwardmost bulkhead below waist level appeared to be loose when pushed inward. Officers Gagliardi and Frankel testified that in their experience, vessel bulkheads are constructed in a solid manner to maintain the vessel's structural strength. The officers believed the weakness in the shower wall to be an entrance to the unaccountable space. The fact that the shower lacked any valves to turn the water on and off heightened the officers' suspicion about this area of the vessel.

10. Officer Gagliardi drilled two one-inch inspection holes through the bulkhead. Using a flashlight beam in one hole, he looked through the other hole and observed approximately two feet of voided area aft of the forward bulkhead, and another painted bulkhead. Once the hole was drilled, Officer Frankel was able to smell what he identified as marijuana. This aft bulkhead measured the approximate distance of the main fish hold. Cooper and Gagliardi further believed there was a concealed compartment between the two bulkheads. Gagliardi then cut a larger hole in the forwardmost bulkhead and found a large void space which measured 23″ deep, 14′2″ wide, and 5′5″ high. He saw marijuana residue on the deck of the void space along the vessel's stringers and the walls of the void space, and an access door leading to the void space from behind the vessel's shower wall. Officer Gagliardi also noticed that the showerhead was not connected to any water supply. In addition, Officer Frankel noticed that the paint inside the hidden compartment was still wet, and he discovered two cans of paint aboard the vessel.

11. Officers Gagliardi and Cooper gathered approximately two grams of marijuana residue from the concealed compartment and forward cabin area. The vessel was then seized for United States Customs violations.

12. Claimant, whose deposition testimony was admitted into evidence, was impeached at trial by his inability to explain the discrepancies between his relatively meager income and the money he spent to purchase the vessel, by the major inconsistencies between his deposition testimony and the deposition testimony of Pedro Rodriguez, the captain of the vessel, and by his lack of knowledge concerning what he spent for the boat, and the type of fish he had hoped to sell to a restaurant in which he claimed to be partner.

By way of example:

a) Napoles testified that the reason that Rodriguez took the SEA POWER out to sea at Napoles request was for a test run and to catch some fish that Napoles would sell at a Miami-area restaurant. Rodriguez testified that he, Rodriguez, approached Napoles to take the boat out fishing because Rodriguez's boat was in need of repair.

13. The captain of the vessel, Pedro Rodriguez was also impeached in his deposition testimony. By way of example:

a) Rodriguez claimed in his deposition testimony that he was fishing seventy miles northwest off the Dry Tortugas—a group of Islands west of Key West—and had drifted southward to a point off the west coast of Cuba, where he was spotted by the Coast Guard. The Coast Guard message traffic however, reflects that when the Coast Guard boarded the SEA POWER, Rodriguez told the Coast Guard officers that he had been fishing the Rosario Banks, a point over 400 miles southwest of the Dry Tortugas. The Rosario Banks statement by Rodriguez corroborates the informant's tip that the SEA POWER traveled to Jamaica to pick up a load of marijuana, because the Rosario Banks, and not the Dry Tortugas, are in line with the route that a vessel might take from the United States to Jamaica and back. In addition, the current north of the Dry Tortugas flows South/Southeast, and below the Dry Tortugas, to the East. In addition, the current in the Yucatan Channel flows strongly to the north. Rodriguez, therefore, could not, as he claimed in his deposition, have drifted Southward from a point north of the Dry Tortugas to the point

where he was spotted by the Coast Guard, because he would have had to drift against three strong and different currents.

b) Rodriguez testified that he took showers while on board the vessel, yet the shower was not connected and lacked "On" or "Off" valves.

## CONCLUSIONS OF LAW

■ 1. To establish that forfeiture is appropriate in this cause, the government need only show that there was probable cause that one of the statutes under which the government is proceeding has been violated. *United States v. One (1) 1982 28' International Vessel*, 741 F.2d 1319, 1321 (11th Cir.1984).

2. Probable cause is defined as a reasonable ground for belief of guilt supported by less than prima facie proof, but more than mere suspicion. *United States v. One 1978 Chevrolet Impala*, 614 F.2d 983, 984 (5th Cir.1980); *United States v. One 1975 Ford F100 Pick-up Truck*, 558 F.2d 755, 756 (5th Cir.1977).

3. When the defendant vessel, the SEA POWER, was boarded by United States Customs Patrol Officers Gagliardi and Cooper in Key West on October 3, 1984, a field-test for marijuana that was discovered in plain view proved positive, and approximately 2 grams of marijuana were subsequently recovered in and around a secret compartment found below the deck of the vessel. The presence of the marijuana in the defendant vessel establishes that the vessel—which by all accounts had been traveling for some time outside the United States—facilitated the receipt, possession and concealment of a controlled substance and contraband article in violation of 19 U.S.C. § 1595a, 21 U.S.C. § 881, and 49 U.S.C. § 781.

■ 4. "There can be no question that marijuana constitutes contraband under the statute," and "a vehicle is subject to forfeiture no matter how small the quantity of contraband found. For purposes of forfeiture, positive results in a field test furnish sufficient proof as to the existence of contraband." *28' International Vessel*, 741 F.2d at 1322. The Court therefore concludes that the United States of America has met its burden of establishing probable cause for the seizure of the SEA POWER and the institution of this forfeiture action.

■ 5. With respect to the initial boarding of the SEA POWER, Customs officials, may, pursuant to 19 U.S.C. § 1581(a), without a warrant or any suspicion of wrongdoing, board and search a vessel having access to the open seas. *United States v. Villamonte-Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). Section 1581(a) has been interpreted to authorize a stop "without even a modicum of suspicion." *28' International Vessel*, 741 F.2d at 1321. The statute may be relied upon even when there is no intent to inspect the vessel's documents. Similarly, when a vessel not actually in the water is spotted at or near a bay or similar opening to international waters and the vessel is large enough to have travelled outside the United States, customs interests may well be implicated. *See United States v. Hernandez*, 668 F.2d 824, 827 (5th Cir.1982) (Unit B). The SEA POWER was large enough to traverse international waters, and was searched by the Customs officers at a point of immediate access to waters opening on to international waters. The initial boarding was therefore properly made pursuant to 19 U.S.C. § 1581(a).

■ 6. Moreover, even if a warrantless boarding and search requires a reasonable suspicion, *see United States v. Kent*, 691 F.2d 1376 (11th Cir.1982), *cert. denied*, 462 U.S. 1119, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983), a tip from a known, proven informant can justify a reasonable suspicion of criminal activity. *See id.* at 1379. The Court concludes that even if reasonable suspicion were required, the tip of the confidential, reliable informant would have itself supplied the requisite reasonable suspicion. That suspicion is made even stronger by the unexplained hauling of the boat out of the water, and the warrantless boarding and search was therefore proper.

7. The Customs boarding and search in this case were also justifiable as a border search. The government's sovereign authority to protect itself justifies a warrantless search without probable cause or reasonable suspicion of persons or things crossing the border into the United States and of their vehicles. *Torres v. Puerto Rico*, 442 U.S. 465, 472–73, 99 S.Ct. 2425, 2430–31, 61 L.Ed.2d 1 (1979); *United States v. DeGutierrez*, 667 F.2d 16, 18–19 (5th Cir.1982) (Unit B). These searches may be concluded either at international border checkpoints or their functional equivalents. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539–40, 37 L.Ed.2d 596 (1973); *United States v. Mcpherson*, 664 F.2d 69 (5th Cir. 1981) (Unit B).

8. To validate a border search, it must be shown that the conveyance crossed an international border. *United States v. Bachner*, 706 F.2d 1121, 1128 (11th Cir. 1983). It is not necessary for customs agents to actually view the border crossing *United States v. Moore*, 638 F.2d 1171, 1173 (9th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981); *United States v. Ingham*, 502 F.2d 1287, 1290 (5th Cir.1974), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975).

9. In this case, the officer received a tip from a confidential reliable informant who had been proven accurate in the past that the SEA POWER was going to Jamaica to pick up a load of marijuana and return to the United States. The officers noticed that boat had vanished from the place it was being stored, and had returned sometime thereafter. They were informed by a boatyard employee that the captain of the vessel had been at sea for some length of time. Furthermore, although the boat was brand new and in no apparent need of repair, it had been hauled out of the water.

10. Based on these observations, coupled with the information provided in the tip, the Customs officers could reasonably conclude that a border crossing had taken place and act accordingly. They are "entitled to draw reasonable inferences from circumstances and base their actions on common sense judgments." *United States v. Bachner*, 706 F.2d at 1128. Accordingly, the Customs officers could reasonably conclude that a border crossing had recently taken place and their boarding and subsequent search of the vessel was appropriate.

11. Once the officers were aboard the vessel and noticed that there was space beneath the deck that could not be accounted for and that the vessel was in no obvious need of repair yet was hauled out of the water, they were furnished with the reasonable suspicion necessary to examine the interior of the vessel "whose construction reveals a capacity to conceal significant amounts of cargo." *28' International Vessel*, 741 F.2d at 1321, quoting *United States v. Whitmire*, 595 F.2d 1303, 1315 (5th Cir.1979).

12. The officers' further inspection of the lower deck, and the discovery of the small fish hold, the wobbly shower wall, the shower with no valves and the non-matching nails on the wobbly shower wall warranted the further inspection which revealed the hidden compartment, which in turn resulted in the discovery of the marijuana residue giving rise to the forfeiture. *See id.* The search and subsequent seizure of the vessel were therefore entirely proper, and the government has met its burden of showing probable cause to believe that the SEA POWER was used to transport or facilitate the transportation of contraband in violation of the aforementioned statutes.

13. Once the government has established probable cause, the burden of proof shifts to claimant to prove a defense to the forfeiture. *Ford F100 Pick-up Truck*, 558 F.2d at 756; *United States v. One 1971 Chevrolet Corvette Automobile*, 496 F.2d 210, 212 (5th Cir.1974); *United States v. One (1) 30 Foot 1982 Morgan Vin.*, 597 F.Supp. 589, 591 (M.D.Fla.1984). The claimant must prove a defense by a preponderance of the evidence. *Ford F100 Pickup Truck*, 558 F.2d at 756.

14. "Innocence [of the claimant], in and of itself, is an insufficient defense to forfeiture," *United States v. One (1) 1957 Rockwell Aero Commander 680 Aircraft,* 671 F.2d 414, 417 (10th Cir.1982). To prevail on the defense of innocence, a claimant must establish that 1) he was not involved in the wrongful activity, 2) he was not aware of the wrongful activity, and 3) he had done all that reasonably could be expected to prevent the proscribed use of his property. *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 689, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452; *28' Foot International Vessel,* 741 F.2d at 1322.

15. The Court concludes that claimant failed to establish the defense of innocence by a preponderance of the evidence. Indeed, the court finds that claimant was not uninvolved in the illegal ability; he was in fact knowledgable of the unlawful activity.

16. The Court further concludes that claimant not only did not do all that he could reasonably be expected to do to prevent the illegal use of his vessel, he actually constructed this vessel to smuggle merchandise into the United States in violation of 19 U.S.C. § 1703, as evidenced by the presence of a false or secret compartment. A false or secret compartment is a prospective storage area that is not apparent to the average user of a conveyance and serves no legitimate function. The unusual location of the compartment opening behind the paneled shower wall demonstrates that it was built in such a way as to remain hidden from view. The deposition testimony of Pedro Blanco Serrano demonstrates that claimant knew about the compartment.

17. Although claimant, the carpenter Lazaro Llanes and the fiberglass man, Pedro Serrano, all claimed that the compartment was to be used for refrigeration, their explanation was simply not credible. Customs Patrol Officer Gagliardi testified that the size of the compartment was far larger than necessary to hold the refrigeration equipment that might be used in such a vessel. In addition, although Llanes' deposition indicates that he was directed to seal up the compartment, a large access point remained available behind one of the shower walls. Finally, the fact that the compartment smelled like marijuana when opened, contained marijuana residue and had been freshly painted indicates the purpose for which the compartment was used. The compartment was used to hide the contraband contained in the vessel, and the paint was used in an effort to conceal the SEA POWER's marijuana smuggling activities.

18. Based on the foregoing, this Court is of the opinion that the SEA POWER is subject to forfeiture for violations of 19 U.S.C. §§ 1595a(a), 1703, 21 U.S.C. § 881, and 49 U.S.C. § 781, and the United States is entitled to a Final Judgment of Forfeiture.